Filed 5/13/14  Citizens Advocating for Roblar Rural Quality v. County of Sonoma CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CITIZENS ADVOCATING FOR ROBLAR RURAL QUALITY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>COUNTY OF SONOMA et al.,<br><br>      Defendants and Appellants;<br><br>JOHN BARELLA et al.,<br><br>      Real Parties in Interest and Appellants. | A136877<br><br>(Sonoma County<br>Super. Ct. No. SCV-248943) |

The County of Sonoma (County) certified a final environmental impact report (EIR) and granted necessary land use permits for an aggregate quarry (hereafter Quarry or Quarry Project).  Citizens Advocating for Roblar Rural Quality (CARRQ), a nonprofit corporation, filed a petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), challenging the County's approvals.  The trial court granted the petition in part, finding that failure to test or study potential water quality contamination from a neighboring landfill resulted in factual conclusions unsupported by substantial evidence; certain specified environmental mitigation measures were inadequate or constituted a prohibited deferral of mitigation; and evidence and analysis regarding the impact of widening an access road on an adjacent creek was inadequate.

1

The Quarry Project's proponents, real parties in interest John Barella and the John E. Barella and Andrea M. Barella Trust (collectively Barella), are joined by the County in an appeal from the judgment. Barella contends that in granting the writ, the trial court improperly ignored substantial expert evidence, opinions, and studies supporting County's actions and made improper de novo determinations. We reverse.

## I.     BACKGROUND

On December 4, 2003, Barella submitted its application for the Quarry Project[1] to the County seeking permits and rezoning for development of a hard rock aggregate mine on a 198.7 acre parcel located at 7601 Roblar Road in southern Sonoma County, approximately five miles west of the City of Cotati. The Quarry site is east of Roblar Road and is bounded to the north by an abandoned County landfill (Landfill). The Quarry Project contemplated development of a 65-acre quarry pit with mining and processing of approximately 570,000 cubic yards of aggregate material annually.[2] The County determined that the Quarry Project was subject to the environmental review requirements of CEQA and the Sonoma County Permit and Resource Management Department prepared and circulated a draft EIR for comment from May to July 2008. A public hearing on the draft EIR was held on June 19, 2008. After response to public comment, a proposed final EIR was released on October 15, 2009.[3] A public hearing on the final EIR was held before the County's planning commission on December 17, 2009. As discussed in greater detail *post*, the North Coast Regional Water Quality Control

---

[1] The application (entitled "Roblar Road Quarry Surface Mining and Reclamation Plan Application") was originally submitted in the name of North Bay Construction, Inc, an entity owned by Barella.

[2] The proposed location is designated as a priority site for aggregate production in the November 1994 "Sonoma County Aggregate Resources Management Plan and Environmental Impact Report," a document Barella included in his April 26, 2013 request for judicial notice. The document comprises part of the administrative record in this matter and we therefore grant the request. (Evid. Code, § 452.)

[3] The draft and final EIR's were prepared for the County by Environmental Science Associates and subconsultants including Miller Pacific Engineering Group (geology, soils, seismicity) and Balance Hydrologics, Inc. (hydrology, water quality).

Board (Regional Water Board), as a CEQA responsible agency, submitted a comment letter on December 15, 2009, questioning the adequacy of the final EIR's assessment and mitigation of water quality impacts associated with the Landfill's proximity to the Quarry. In response, Barella submitted a revised water management plan to the final EIR. The final EIR incorporated these changes, and was further revised to include additional mitigation measures. On April 1, 2010, the planning commission took additional comment on the proposed final EIR revisions, and voted to recommend that Sonoma County Board of Supervisors (Board of Supervisors) certify the final EIR, as revised, and approve the Quarry Project with conditions.

After the initial recommendation to approve the final EIR, further surveys on the Quarry Project site found larvae of the California tiger salamander, a protected species under state and federal law. Analysis of California tiger salamander impacts and mitigation measures were revised and included in recirculated portions of the draft EIR.[4] The recirculated portions of the draft EIR were released for public comment on June 15, 2010. On July 15, 2010, the planning commission held a public hearing on the recirculated portions of the draft EIR and, on September 16, 2010, held a public hearing to consider the associated responses to comments and the final EIR for the Quarry Project. The planning commission again recommended (unanimously) that the Board of Supervisors certify the final EIR, adopt a statement of overriding considerations, and approve the Quarry Project. The final EIR included the draft EIR and associated response to comments document, the "Revised Response to Comment HYD-1" and revised water management plan, and the recirculated portions of the draft EIR and associated response to comments document.

At an October 19, 2010 public hearing, the Board of Supervisors received a staff report and accepted oral and written testimony. The Board of Supervisors then closed the public hearing, and tentatively approved the final EIR and what was designated as

---

[4] The recirculated portions of the draft EIR also included an updated analysis of greenhouse gas emissions and mitigation measures addressing thresholds of significance recently adopted by the Bay Area Air Quality Management District.

"Modified Alternative 2" for the Quarry Project.  The Board of Supervisors directed staff to prepare findings consistent with the board's determinations, and continued the matter to the following December for final action.  On December 14, 2010, the Board of Supervisors voted to certify the final EIR (Resolution No. 10-0902), as well as voted to adopt CEQA findings and a statement of overriding considerations, adopt a mitigation monitoring and reporting program and approve Modified Alternative 2 (Resolution No. 10-0903).[5]

On January 13, 2011, CARRQ filed the instant petition for writ of mandate challenging the Quarry Project approvals.  After certification of the administrative record and briefing, the superior court issued a tentative ruling granting the writ in part on June 20, 2012.  Oral argument was heard on June 22,  and the court filed its statement of decision on August 2.  The court found the final EIR deficient, and ordered the Quarry Project approvals vacated:  "(1) On the basis that the failure to test or study the neighboring Landfill water quality for contamination has '. . . reached factual conclusions unsupported by substantial evidence.'  [Public Resources Code, §] 21168.5; [¶] (2) On the basis that the project description of the mitigation preserve is inadequate and, in some measure, constitutes a prohibited deferral of mitigation; [¶] (3) On the basis that the EIR fails to provide adequate analysis of the impacts or efficacy of the mitigation preserve; and [¶] (4) On the basis that the evidence and analysis regarding the impact of widening Roblar Road on Americano Creek and related mitigation measures is inadequate."  The court denied the petition on all other points.

After responding to Barella's objections and requests for clarification, the court entered judgment on October 10, 2012, and a peremptory writ of mandate issued on that date.  This timely appeal followed.

---

[5] The Board also approved entitlements specific to the Quarry Project, including a zone change to add a mineral resources overlay zone to the site, a use permit with a 20-year term for mining and recycling of asphalt, concrete and other materials, and a reclamation plan for the Quarry site.

4

## II. DISCUSSION

A.   *CEQA Review Standard*

" 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' (Cal. Code Regs., tit. 14, § 15002.)[6]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286.) CEQA's purpose is to compel government to make decisions with environmental consequences in mind. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights I*).)

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427, fns. omitted (*Vineyard*).) "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) Under CEQA, "substantial evidence includes fact,

---

[6] Guidelines for implementing CEQA are found under California Code of Regulations, title 14, section 15000 et seq.

5

a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1).)

Our task is essentially identical to that of the trial court. (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070.) Accordingly, "we review the agency's actions directly and are not bound by the trial court's conclusions. [Citations.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816–817.) In that sense appellate judicial review under CEQA is de novo. (*Vineyard, supra,* 40 Cal.4th at p. 427.) We must therefore independently determine whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations. (*Ibid*.)

A reviewing court "shall not exercise its independent judgment on the evidence but shall only determine whether the [agency's] act or decision is supported by substantial evidence in light of the whole record." (Pub. Resources Code, § 21168.) In determining whether an agency has prejudicially abused its discretion, " 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [agency's decision].' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.) Our review for substantial evidence applies a deferential standard that is satisfied if "the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached." (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 968.) We indulge all reasonable inferences from the evidence that would support the agency's determinations. If more than one inference can be drawn from the evidence, " 'a reviewing court is without power to substitute its deductions' " for those of the agency. (*Western States Petroleum Assn.,* at p. 571.) "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's [decision] on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh

6

conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard, supra,* 40 Cal.4th, at p. 435.)

B.      *Groundwater Issues*

CARRQ challenges the adequacy of the final EIR's analysis of Quarry operations on groundwater flows, and possible release of contaminants from the adjacent Landfill. It contends that the final EIR acknowledged the risk that contaminants or pollutants from the Landfill could seep into the Quarry site as a result of mining operations, but that the County refused to conduct or allow testing of the Landfill to determine and disclose the risk posed to regional water quality.[7]  As a consequence, CARRQ argues, the County's finding that the risks to groundwater would be less than significant lack substantial evidence support.  "Without testing and associated analysis, the County was unable to understand the magnitude of the impact and to determine if there were feasible mitigation measures that could reduce this impact to an acceptable level."  CARRQ also argues that failure to test for contaminants in the Landfill resulted in the EIR failing to adequately describe, in good faith, the environmental setting of the Quarry Project as required by CEQA.

Barella responds that CARRQ mischaracterizes the record and ignores, and fails to cite, evidence in support of the County's findings.  The burden is on the party challenging an EIR to show it is inadequate, and to affirmatively show no substantial evidence in the record supported the agency's findings.  (*California Native Plant Society v. City of*

_____

[7] The draft EIR also evaluated potential impacts of blasting operations from Quarry operations on the surrounding areas, including the Landfill.  A hydrologist testified before the planning commission that, given the nature and density of subsurface bedrock fractures, blasting "would not influence the [underground water] flow regime . . . much farther than probably 20 or 30 feet from where the blast was, so from the edge of the Quarry, let's say 20, 30 feet out, maybe even 50 feet.  That's still a short distance compared to the distance between the Quarry and the landfill itself and to Americano Creek as well."  The draft EIR concluded that proposed blasting would not impact the integrity of the landfill cells, landfill infrastructure, or the surrounding ground on the landfill property, and consequently would not in and of itself create or increase potential for movement of potential contaminants from the landfill cells offsite.  CARRQ does not specifically challenge this finding on appeal.

7

*Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 (*California Native Plant Society*).) "As with all substantial evidence challenges, [a party] challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for [the challenging party's] failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

The draft EIR found: "Excavation of the proposed quarry could cause groundwater which may contain contaminants to enter the quarry walls as seepage. In addition, groundwater from the on-site production wells proposed to be used for quarry operations may contain contaminants. Contaminated water could degrade water quality in Ranch Tributary and Americano Creek if not properly contained and treated prior to discharge. This would be a potentially significant impact." In its approvals, the County found that the potential impact would be mitigated to a less than significant level by incorporation of Barella's revised water management plan, implementation of specified mitigation measures, and implementation of an enhanced groundwater monitoring well system. The trial court agreed with CARRQ that the final EIR was rendered inadequate by a failure to test or study Landfill water quality and whether Quarry operations would change flow patterns and cause potentially contaminated water to flow from the Landfill to the Quarry and into waterways.

Our analysis begins with the presumption that the County's decision is correct, and CARRQ bears the burden of proving the contrary. (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 11–12.) We conclude that substantial evidence supports the final EIR finding.

1.     *Landfill Conditions*

The Landfill is located adjacent to and north of the Quarry site. The closest waste cell in the Landfill is approximately 400 feet away from the Quarry site. The Landfill was operated as an open burn pit from 1956 through 1967. Between 1967 and 1971, it was operated as a sanitary landfill by Sonoma County, using a landfill technique known as trench filling. During the time the Landfill site was operated as a burn pit and sanitary

8

landfill, it received primarily residential and commercial waste, along with minor agricultural waste. The City of Santa Rosa reopened the landfill in 1972 for disposal of demolition debris along the top of the lowest waste disposal unit, and then covered it with soil. Operations were terminated in 1973 and no additional waste has been accepted since that time, but extensive grading, drainage improvements, and revegetation have occurred at the Landfill site.

Three main pads in the Landfill step up the slope from Roblar Road. The lowest and northernmost pad contains two waste cells and is situated at approximately 200 feet above sea level. A middle pad containing a single waste cell is located at approximately 270 feet above sea level. The upper and southernmost pad contains a single waste cell and is at approximately 350 feet above sea level. The Landfill is unlined and leachate[8] which percolates through the site is removed from the Landfill via an onsite leachate collection system, and transported to an offsite treatment plant. Leachate from the Landfill is routinely tested for potential hazardous constituents. Testing reports indicated that the leachate does not contain chemical constituents at levels considered hazardous waste under title 27 of the California Code of Regulations.

In 1991, three groundwater monitoring wells (R-l, R-2 & R-3) were installed on Landfill property as part of the County's solid waste water quality assessment test (SWAT) for the Landfill.[9] A SWAT monitoring program for the Landfill focused on potential migration pathways for surface water and groundwater, and included sampling and analysis for halogenated and volatile organic compounds, pesticides, PCB's, and metals. A 1992 report to the County showed that toluene was the only volatile organic compound detected (in monitoring well R-l) at a concentration slightly above the laboratory method detection limit. Toluene was not detected again in the subsequent

[8] Leachate is a "liquid formed by the drainage of liquids from waste or by the percolation or flow of liquid through waste. It includes any constituents extracted from the waste and dissolved or suspended in the fluid." (Cal. Code Regs., tit. 27, § 20164.)

[9] Testing of surface water quality at the Landfill is performed by the Sonoma County Department of Transportation and Public Works, and quarterly reports are submitted to the Regional Water Board.

sampling events under the SWAT. The report concluded that " 'there has been little or no impact to water quality and the environment from past landfill operations, and there is no indication of leachate leaving the site boundaries.' " The sampling and analysis done between 2004 and 2008 confirmed the presence in well R-1 of low, dissolved concentrations of a volatile organic compound (cis-l,2-Dichloroethene), a chemical commonly found in chemical cleaning products, and the organic compound vinyl chloride. While the levels of each were at or slightly over the laboratory method detection limits, they were again in all cases below applicable state and federal water quality objectives for drinking water.

The most recent analysis of groundwater chemistry data collected from the Landfill monitoring wells was contained in a July 2009 groundwater monitoring report prepared for the County by Pacific Geoscience. The data was compared against primary and secondary maximum contaminant levels (MCL's) set by both the United States Environmental Protection Agency and the State of California. None of the samples exceeded the available MCL's for general chemistry. Groundwater collected from monitoring well R-l met or exceeded primary MCL's set by the State of California for chromium and secondary MCL's for iron and manganese, and as previously noted, was negative for volatile organic compounds with the exception of cis-l,2-Dichloroethene. Groundwater from well R-2 exceeded state secondary MCL's for iron and manganese. The samples from wells R-l and R-2 were found to be "not dissimilar to a typical drinking water in terms of its major ions." Metals data from well R-3 in some samples, however, exceeded primary or secondary MCL's for arsenic, barium, chromium, iron, manganese, mercury and nickel.

2. *Existing Quarry Project Site Conditions*

In January 2007, during geotechnical analysis of the Quarry Project, three new groundwater monitoring wells (MW-l, MW-2 & MW-3) were installed roughly in line between the Landfill and proposed Quarry footprint. The new wells served as "sentry wells" and were located to serve as boundary monitoring points to monitor groundwater quality and detect whether any pollutants were migrating from the Landfill to the Quarry

site. Five quarterly monitoring reports were completed for the County by consultant Advanced GeoEnvironmental, Inc. from February 2007 through March 2008. The groundwater monitoring program included sampling and analysis of groundwater for water chemistry (e.g., pH, alkalinity, hardness, and TDS), salts, organochlorine pesticides, PCB's, semivolatile organic compounds, and trace metals. Laboratory analysis of samples collected showed low concentrations of volatile organic compounds, which were in all cases below applicable state and federal water quality objectives for drinking water.

3. *Migration of Groundwater from the Landfill*

Subsurface exploration determined that the groundwater resides in three different geologic zones, and the Landfill and Quarry sites are situated in different watersheds. A ridgeline and a hydrogeological divide (the Ranch Tributary watershed divide) exists between the Landfill, north of the divide, and the Quarry site, south of the divide. A calibrated groundwater flow model was developed for the Quarry site and Landfill by consultant Geomega Inc. (Geomega). Results from the groundwater model showed that a groundwater divide would consistently be present between all levels of the Landfill and the Quarry, preventing groundwater and leachate originating at the Landfill from flowing to the Quarry under any scenario, and that under all conditions groundwater beneath the Landfill would flow northward towards Americano Creek and not to the Quarry site.[10]

Geomega also calculated the result of what it termed a hypothetical "worst case" scenario, assuming that groundwater beneath the Landfill could flow to the Quarry site, and that groundwater discharging along the entire north side of the Quarry originated beneath the Landfill. In that event, groundwater flowing from the lower levels of the Landfill (the areas of wells R-1 & R-3), concentrations of metals and volatile organic compounds would be diluted below detection limits when reaching the quarry pit and any groundwater from the Landfill impacted by leachate "would be acceptable for all

---

[10] The draft EIR concluded that the Ranch Tributary watershed divide would shift somewhat north of its existing location as a result of Quarry excavation.

constituents and would be either at background levels or below MCL[']s provided by both [United States Environmental Protection Agency] and the State of California" and "would not exceed state and federal drinking water standards."

4.    *Regional Water Board Comments*

As noted *ante*, the Regional Water Board submitted comments to the circulated final EIR on December 15, 2009.  The Regional Water Board expressed concern with two significant potential impacts of the Quarry Project.[11]  The first was with the adequacy of mitigation measures for impacts to surface waters, with discharge of excess flows of groundwater and storm water.  The second concern was the identification of heavy metals and other pollutants in groundwater at levels exceeding ground and surface water quality objectives.  The Regional Water Board said that it was "not convinced by the documentation provided that excavation and draining of groundwater will not result in the movement of pollutants in the aquifer, thereby causing the degradation of water quality."  More specifically, the comment questioned the adequacy of the hydrologic investigation of the Landfill site for leachate or groundwater impacts.  The comment concluded that "the [final EIR] falls short of outlining a clear path to avoid groundwater impacts to receiving waters."

5.    *Barella's Revised Water Management Plan*

To allow staff response to the comment and to questions by planning commissioners following the December 17, 2009 public hearing, further public hearing on the final EIR was scheduled for February 4, 2010, and then continued to April 1, 2010. After consulting with the County and the Regional Water Board, Barella submitted a revised water management plan in March 2010, prepared by CSW/Stuber-Stroeh Engineering Group, Inc. and PES Environmental, Inc., and incorporating Geomega's

---

[11] CARRQ cites, inter alia, the letter as evidence that the mitigation measures proposed by Barella were inadequate to reduce the environmental impacts to a less than significant level.  Pointing to evidence of a disagreement with other agencies is not enough to carry the burden of showing a lack of substantial evidence to support the City's finding.  (*California Native Plant Society, supra,* 172 Cal.App.4th at p. 626.)

flow modeling. The revised water management plan expanded the management of water resources for the project and provided that all precipitation, seepage, and process water from the Quarry site would no longer be discharged to surface waters, but would be captured and conveyed to sediment control basins for testing, treatment if required, and reuse onsite. The onsite treatment system was also modified to address Regional Water Board concerns about treatment of metals. Only surface water runoff occurring outside the Quarry footprint would be discharged to the adjacent Ranch Tributary or Americano Creek, and the revised water management plan would maintain "baseline" surface water conditions in the both the Ranch Tributary and Americano Creek. Barella further proposed an expanded monitoring well network. A "Revised Master Response HYD-1" dealing with hydrology and water quality issues was prepared and incorporated in the final EIR. The Regional Water Board found the revised water management plan had "largely addressed the Regional Water Board comments."

At the continued public hearing on April 1, 2010, the planning commission considered the final EIR including the revised water management plan, and heard testimony from Geomega hydrologist Bill Linderfelt, Ph.D. The planning commission determined that the final EIR, as revised, adequately characterized existing groundwater flow and groundwater quality on the Landfill and Quarry sites, appropriately and conservatively assessed potential water quality impacts associated with the Quarry Project development, and prescribed adequate mitigation to reduce potential impacts to less than significant. The planning commission found that the revised water management plan assured that the project would not result in degradation of groundwater and surface water quality and recommended approval and certification of the final EIR. On December 14, 2010, the Board of Supervisors approved certification of the final EIR. They found that potential discharge of contaminated water to Ranch Tributary and American Creek would be mitigated to a less than significant level by incorporation of the revised water management plan and the mitigation measures required by it, and by

13

implementation of an enhanced groundwater monitoring well system proposed by Barella.[12]

6.   *Analysis*

CARRQ focuses its challenge to these findings on the failure of the County to conduct or permit additional testing within the waste cells of the Landfill.  CARRQ insists that the final EIR is deficient because "no one knows what type of contaminants are in the Landfill and at what concentrations these contaminants may be found within the Landfill because the interior of the Landfill has never been tested . . . ."[13]  (Boldface omitted.)  But the issue is not what contaminants might be *present* within the interior of the Landfill.  Rather, the question is what contaminants are at risk for *release* from the Landfill by virtue of the Quarry Project.  "CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project.  The fact that additional studies might be helpful does not mean that they are required.  [Citations.]"  (*Association of Irritated Residents v. County of Madera, supra,* 107 Cal.App.4th at p. 1396; see also *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1115 ["additional testing is required only if the initial testing is insufficient"].)

---

[12] PES Environmental, Inc. (Sept. 27, 2010) Work Plan for Installation of Additional Groundwater Monitoring Wells, Roblar Road Quarry.

[13] As CARRQ notes, the County declined to permit additional testing in the Landfill footprint.  At the public hearing on October 19, 2010, a member of the Board of Supervisors asked staff why further studies and analysis that Barella was apparently willing to conduct were not done and included in the final EIR.  The response was that: "The applicant came to the Department of Public Works seven months ago.  I think it was in the springtime.  After that they met with the regional board and asked if they could come on to the landfill and do some analysis.  And they had a two- or or three-page laundry list of all the things that the regional board staff wanted to look at which was akin to the full characterization that we did out at the center of the disposal site, which is an active landfill.  And we—staff, you know, we're not really interested in opening up the landfill for a full characterization that would cost $700,000 to study and you never know what you were going to get with that."

14

The risk identified in the draft and final EIR's was the possibility of seepage of potentially contaminated groundwater from the Landfill into the Quarry site, and the concern that "[c]ontaminated water could degrade water quality in Ranch Tributary and Americano Creek if not properly contained and treated prior to discharge." CARRQ points to no other identified risk that Landfill contaminants, of whatever nature, would be released as a consequence of the Quarry's operations.[14] The data considered by the County in reaching its conclusion that any environmental risks would be mitigated to less than significant included groundwater monitoring data from the Landfill site for a period of more than a decade; groundwater modeling prepared by qualified experts confirming that a geological divide existed, and would continue to exist, between the Landfill and the Quarry Project site; and the revised water management plan providing that all precipitation, seepage, and process water from the Quarry Project site would be contained and treated onsite, with only surface water runoff from outside the Quarry footprint discharged into Ranch Tributary or the Americano Creek.

In applying the substantial evidence standard, we accord great deference to the administrative agency's substantive factual conclusions. (*Vineyard, supra,* 40 Cal.4th at p. 435.) Further, we are required to " 'resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.]" (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.)

We reiterate that our task is "not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated." (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.) We "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.]" (*Ibid.*) Here, there is "enough

---

[14] As discussed *ante*, CARRQ does not challenge here the final EIR conclusion that proposed explosive blasting in Quarry operations would not impact the integrity of the Landfill cells, Landfill infrastructure, or the surrounding ground on the Landfill property, and would not in and of itself create or increase potential for movement of potential contaminants from the Landfill cells offsite.

relevant information and reasonable inferences from this information that a fair argument can be made to support [the County's] conclusion, even though other conclusions might also be reached." (See Cal. Code Regs., tit. 14, § 15384, subd. (a).)

C.      *Roblar Road Mitigation Measures*

CARRQ complains that the final EIR failed to analyze what it terms the "last-minute decision" to route gravel truck traffic beside the Americano Creek, and that substantial evidence does not support the County's finding that any impacts on Americano Creek from required roadway improvements on Roblar Road would be reduced to less than significant levels. We again disagree.

1.      *Roblar Road and Proposed Haul Routes*

Roblar Road is a two-lane major rural collector road that provides direct access to the Quarry Project site. A traffic study for the EIR estimated that production from the Quarry would generate between 151 and 240 truckloads of material per day, or 302 to 480 one-way truck trips. This was projected to increase the percentage of average daily truck traffic on Roblar Road west of project site from an existing 8 percent to an estimated 19 percent (an 11 percent increase), and on Roblar Road east of the Quarry site, from an existing 9 percent to an estimated 14 percent (a 5 percent increase). Roblar Road currently has approximately 10-foot wide traffic lanes, with portions as narrow as 8.5–9.0 feet (less than the current County standard of 12 feet), and minimal or no paved shoulders (less than the current County standard of six feet). Americano Creek is a regional creek running adjacent to Roblar Road in the immediate vicinity of the Quarry site. Americano Creek crosses Roblar Road three times, and follows closely and roughly parallel to Roblar Road for several hundred feet in the vicinity of the Quarry site.

Mitigation measures E.3a and E.4a of the draft EIR recommended improvement of Roblar Road along its approximate six and one-half mile length (as well as other connecting roads) to meet current County road design standards, including two 12-foot wide vehicle travel lanes, two six-foot wide shoulders, and associated striping and signage to meet Class II bike facilities. The draft EIR noted that construction of the roadway improvements would also result in potential secondary environmental impacts.

16

The secondary impacts resulting from implementation of offsite transportation mitigation measures were analyzed separately. The draft EIR recognized that the required offsite improvements would mitigate Quarry Project impacts, and provide a beneficial effect on the movement of large vehicles, cars and bicyclists on haul routes, but that construction and implementation of these offsite transportation improvements would also result in their own potentially significant temporary and long-term environmental impacts on land use and agricultural resources, geology and soils, hydrology and water quality, hazardous materials, biological resources, transportation and circulation, air quality, noise, aesthetics and cultural resources. It discussed the "likely range of potential environmental impacts," but noted that "[a] detailed analysis of the specific off-site impacts cannot be completed until and if design work was undertaken that would provide information on the specific alignment and structural improvements that may be required along Roblar . . . Road[] to accommodate the proposed widening. If the proposed roadway improvements were pursued, subsequent detailed environmental analysis and County approval would be required."

An alternative haul route suggested by Barella (Alternative 2) was included in the draft EIR and was considered by the Sonoma County Permit and Resource Management Department to be the "environmentally superior alternative" due to reduced secondary impacts associated with the improvements to Roblar Road (and other access roads) otherwise required as project mitigation. Under this alternative, all Quarry truck traffic would use two new temporary private off-road segments through other property adjacent to the Quarry site (Access Road 1 & Access Road 2), and reduced the extent of improvements to Roblar Road, as well as various other existing public roads. No project haul trucks would use Roblar Road east of the Quarry Project site. Alternative 2, however, required construction of Access Road 1 across a County agricultural preserve and open space district conservation easement and conflicted with the Williamson Act's[15]

---

[15] The Williamson Act (Gov. Code, § 51200 et seq.) empowers local governments to establish "agricultural preserves" consisting of lands devoted to agricultural and other compatible uses.

agricultural restrictions in other respects. Consequently, in a memorandum to the Permit and Resource Management Department dated October 19, 2010, Environmental Science Associates suggested a modification to Alternative 2 that would no longer require construction of Access Road 1, with all trucks entering and exiting the Quarry site via the originally proposed access point on Roblar Road (Modified Alternative 2). The Modified Alternative 2 resulted in a requirement that a total approximate 1.6-mile segment of Roblar Road be improved to current County road design standards—an additional 0.6 miles over what would be required in proposed Alternative 2, but significantly less than that required under the original proposal addressed in the draft EIR and its recirculated portions. County staff review found that Modified Alternative 2 would not result in any new significant or substantially more severe environmental impacts than already analyzed in the draft EIR and its recirculated portions, and that no additional environmental review was required. Barella also submitted evidence from his engineers that the roadway improvements under Modified Alternative 2 could be constructed within the boundaries of an existing County right of way.

At the October 19, 2010 public hearing, the Board of Supervisors approved Modified Alternative 2, which Barella characterizes as a "hybrid" of the haul route proposed by Alternative 2 and that originally proposed, including the driveway configuration entering the Quarry site. The County found that Modified Alternative 2 would not result in any new construction impacts associated with offsite transportation improvements that were not already evaluated in the EIR (section V; impact E.8) and, although Modified Alternative 2 would result in an additional 0.6 mile of public road improvements, the offsite improvements required for Modified Alternative 2 would be substantially less than the originally proposed project. In approving the hybrid haul route, the County found that it would avoid potentially significant land use and agricultural resource impacts associated with the implementation of offsite mitigation transportation improvements, and that any associated environmental impacts, including any impacts to jurisdictional waters, wetlands and riparian habitat, would be mitigated to less than significant levels with the required conditions of approval.

18

2.     *Project Components and Secondary Environmental Impacts*

The parties first disagree about the level of scrutiny required for environmental impacts associated with the offsite transportation improvements. Barella argues that the required Roblar Road improvements are mitigation measures generating secondary impacts, which are not required to be described by an EIR in as great detail as the primary impacts caused by the project components.[16] CARRQ insists that the widening of Roblar Road is an integral aspect of the project as a whole, requiring complete analysis, since the "Quarry development and operations are contingent upon roadway widening."[17] (See *Tuolumne County Citizens for Responsible Growth, Inc. v City of Sonora* (2007) 155 Cal.App.4th 1214 (*Tuolumne*).) We agree with Barella that *Tuolumne* is distinguishable.

The issue in *Tuolumne* was whether failure to analyze certain road realignment improvements required as a condition of approval for a home improvement shopping center resulted in improper segmenting of a "single CEQA project." (*Tuolumne, supra,* 155 Cal.App.4th at p. 1218.) The City of Sonora did not include the detailed road improvement plans in a mitigated negative declaration prior to public circulation, and undertook a separate CEQA review of the road improvements. The court found that the offsite road realignment improvements were treated improperly as a completely "separate and independent" project. (*Id.* at pp. 1221, 1227–1228.) Contrary to CARRQ's assertion, that is not what occurred here. The secondary environmental impacts of the offsite mitigation measures, including widening of access roadways, were catalogued and discussed in significant detail. Among potential impacts noted were vegetation removal, shallow excavation and grading along the alignment of the road widening improvements,

---

[16] "If a mitigation measure would cause one or more significant effects in addition to those that would be caused by the project as proposed, the effects of the mitigation measure shall be discussed but in less detail than the significant effects of the project as proposed. [Citation.]" (Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(1)(D).)

[17] To the extent that CARRQ suggests that development and operation of the Quarry would not be physically possible without widening of Roblar Road, the record fails to support that contention.

increased creek sedimentation during construction and the possibility of accidental release of contaminants (e.g., fuels and lubricants) during construction, and temporary and/or permanent disturbance of seasonal wetlands and jurisdictional waters in the vicinity of Americano Creek.  Mitigation measures E.8a–E.8p and E.9 were specifically proposed to address these secondary impacts.  Further, *Tuolumne* did not consider the application of California Code of Regulations, title 14, section 15126.4. subdivision (a)(1)(D).  Barella correctly observes that the fact that a mitigation measure is mandated by a lead agency as a condition of project approval cannot thereby transform the measure into an integral project component.  The implementing guidelines require that all mitigation measures be fully enforceable "through permit conditions, agreements, or other legally binding instruments."  (Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(2).)  CARRQ's suggested interpretation and application of *Tuolumne* would effectively eliminate any distinction between primary and secondary environmental impacts and make every mitigation requirement a "project component."

        3.     *Substantial Evidence in Support of Findings*

        CARRQ argues that the final EIR contained no evidence of either the extent or nature of the impacts of the roadway widening on Americano Creek or the efficacy of the mitigation measures, and simply set forth conclusions without requisite analysis.  We read the administrative record differently.

        Exhibit A to the Board of Supervisor's resolution certifying the final EIR included discussion of the secondary impacts resulting from implementing offsite transportation improvements and the related mitigation measures described in section IV.E ("Transportation and Traffic") of the draft EIR.  With respect to Americano Creek, the draft EIR discussed potentially significant secondary hydrology and water quality issues arising from implementation of offsite transportation improvements, including increases in sedimentation, the potential need for new or modified storm drains or culverts where roadway crossings occurred, or potential accidental release of construction related hazardous materials to soil and/or storm water.  While noting that analysis of specific offsite impacts could not be completed until design work for the exact alignment and

structural improvements of the proposed widening was undertaken, and that subsequent detailed environmental analysis and County approval would be required, the draft EIR assessed the likely range of anticipated environmental impacts, and preliminary mitigation measures to reduce those potential environmental impacts.  Vegetation removal, shallow excavation and grading along the new roadway alignment were identified as likely impacts.  Mitigation measure E.8b, reflecting "current engineering practice and the accepted standard of care to mitigate potential impacts from unique geological conditions along the roadway alignments" required that grading and construction specifications for the roadway widening "implement best management practices . . . to reduce or eliminate soil erosion during construction" and incorporation of such measures into a storm water pollution prevention plan for the proposed roadway widening (required as mitigation measure E.8c).[18]  Mitigation measure E.8b required a "design level geotechnical investigation . . . to identify site specific geologic conditions and geotechnical constraints and develop adequate engineering design criteria and remedies to reduce the potential for slope instability from cutting and filling of adjacent slopes along the roadway alignments."  The draft EIR considered secondary impacts on biological resources and found that mitigation measures identified to mitigate potential impacts to biological resources from the proposed Quarry Project (including jurisdictional waters and wetlands impacts), would also be relevant and applicable for mitigating impacts associated with the roadway widening improvements.  Mitigation measure E.8e required Barella to conduct a formal wetland delineation in accordance with the 1987 Corps of Engineers Wetlands Delineation Manual and have it verified by the U.S. Army Corps of Engineers.  Wetland permits and compliance with the Clean Water Act were required if the Corps of Engineers determined that any jurisdictional waters were impacted.  Barella was further required to compensate for the loss of any jurisdictional wetlands.

---

[18] Storm water pollution prevention plans are defined under the federal Clean Water Act (33 U.S.C. § 1251 et seq.) and National Pollutant Discharge Elimination System (33 U.S.C. §1342; 40 C.F.R. § 122.26 (2013).)

CARRQ contends that recognition that further detailed analysis would be required under specific roadway improvement plans and designs constitutes improper deferral of mitigation. "Impermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR. [Citations.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 915–916.)

Deferral of mitigation measure selection is permissible, however, " 'for kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . . , the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]' [Citation.]" (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1029.) " '[T]he details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study.' [Citations.] . . . [¶] Furthermore, a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance. [Citations.]" *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906; *id.* at pp. 889, 907–910 [no improper mitigation deferral where, prior to project commencement, final design parameters for site improvements required review and approval by registered geotechnical engineer and city agency for compliance with codes, ordinances and policies]; see also *California Native Plant Society, supra,* 172 Cal.App.4th at pp. 621–623 [appropriate to defer analysis of exact location of offsite habitat replacement where nothing in record suggested "offsite mitigation measures the [c]ity proposed were not feasible or that the [c]ity had not fully committed to implementing those measures"]; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1394–1396 [no improper deferral where mitigation conditions would be "subject to a host of specific performance criteria

imposed by various ordinances, codes, and standards, as well as other mitigation conditions"].)

We find the identification and discussion of potential secondary environmental impacts to be sufficient under the standards of California Code of Regulations, title 14, section 15126.4, subdivision (a)(1)(D), and we find substantial evidence in the record to support the conclusion reached by the County that any such impacts could be mitigated to less than significant levels. Again, we do " 'not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights I, supra,* 47 Cal.3d at p. 392.)

D.      *Offsite Mitigation Preserve*

Surveys identified the presence of the California red-legged frog (CRLF), a special status protected species on the Quarry Project site. After the April 2010 initial planning commission recommendation to approve the final EIR, further surveys on the project site found larvae of the California tiger salamander (CTS), also a protected species under state and federal endangered species acts. Analysis of CTS impacts and mitigation measures were revised and included in recirculated portions of the draft EIR.[19] The recirculated portions of the draft EIR determined that the Quarry Project would result in the permanent loss of CTS and CRLF breeding habitat (impact D.11). Proposed mitigation measures included requiring that Barella consult with the United States Federal Wildlife Service (USFWS) under section 7 of the federal Endangered Species Act of 1973 to define the necessary mitigation to compensate for the unavoidable impacts to the CTS and its habitat and obtain a "Biological Opinion" for the project. Barella was also required to apply for a California "State Incidental Take Permit" under section 2081, subdivision (b) of the Fish and Game Code if the state Department of Fish and Game determined that the federal authorization under the Biological Opinion was not consistent with the requirements of the California Endangered Species Act (Mitigation measure

---

[19] As noted *ante,* the recirculated portions of the draft EIR also included an updated analysis of greenhouse gas emissions and mitigation measures addressing thresholds of significance adopted by the Bay Area Air Quality Management District.

D.11a). Mitigation for impacts to CTS habitat were further required to be consistent with CTS mitigation identified in a 2005 Santa Rosa Plain Conservation Strategy and in a USFWS 2007 Programmatic Biological Opinion.[20] Mitigation measure D.11b required construction of a replacement pond for a pond to be lost on the Quarry site, and translocation of CTS larvae to the new pond under the direction of the USFWS and Department of Fish and Game. A habitat mitigation plan would be determined by the USFWS based on the findings issued in the project-specific Biological Opinion, including location of the replacement pond, pond size, and hydrology. The County found that any impacts on CTS habitat would be mitigated to a less than significant level by the implementation of mitigation measures D.11a and D.11b and incorporated those measures into the conditions of approval for the project.[21]

On July 21, 2010, Barella made a request to the Sonoma County Agricultural Preservation and Open Space District (District) to clarify or amend a recorded conservation easement on property adjacent to the Quarry site. Barella sought to utilize the adjacent property as a preserve for CTS and CRLF by expanding the size of an existing stock pond and constructing an additional stock pond for use by the two special-status species. On December 14, 2010 (the date of final EIR certification), the Board of Supervisors, acting in their capacity as the Board of Directors of the District, approved a resolution interpreting the conservation easement to permit establishment of the CTS and CRLF mitigation preserve on this adjacent land (Resolution No. 10-0925).

CARRQ contends that the final EIR is inadequate because it did not describe, analyze or even mention the site of its proposed protected species mitigation preserve, precluding the County from determining if the mitigation measures were feasible. CARRQ further argues that omission of Barella's proposal for creation of the mitigation

---

[20] USFWS Programmatic Biological Opinion for U.S. Army Corps of Engineers (2007) Permitted Projects that May Affect California Tiger Salamander and Three Endangered Plant Species on the Santa Rosa Plain, California (Corps File No. 223420N).

[21] The agencies responsible for the Santa Rosa Plain Conservation Strategy had previously concluded that compliance with the interim mitigation guidelines in the strategy would be sufficient to mitigate significant effects to listed species.

preserve on the adjacent open space land constituted a failure to proceed in the manner required by law.

      1.     *Location of the Mitigation Preserve*

We address this issue first, since the parties disagree about the impact of prior related litigation (*Tresch v. County of Sonoma Agricultural Preservation & Open Space Dist. Bd. of Directors* (Jan. 4, 2013, A133472) (*Tresch*) [nonpub. opn.]).[22] Petitioners in *Tresch*, including CARRQ, sought a writ of mandate in the Sonoma County Superior Court requiring the District, inter alia, to set aside approval of Resolution No. 10-0925—alleging violation of CEQA and seeking preparation of a new EIR for the Quarry Project. The trial court sustained the District's demurrer to the CEQA cause of action without leave to amend on the ground that the District's adoption of Resolution No. 10-0925 did not constitute approval of a project within the meaning of CEQA. Barella contends that *Tresch* has already determined that the proposed mitigation preserve is not part of the Quarry Project, and the CARRQ is barred by the doctrine of collateral estoppel from arguing otherwise. CARRQ insists that *Tresch* has "no bearing on this appeal."

"Collateral estoppel is one of two aspects of the doctrine of res judicata. In its narrowest form, res judicata ' "precludes parties or their privies from relitigating a cause of action [finally resolved in a prior proceeding]." ' [Citation.] But res judicata also includes a broader principle, commonly termed collateral estoppel, under which an issue ' "necessarily decided in [prior] litigation [may be] conclusively determined as [against] the parties [thereto] or their privies . . . in a subsequent lawsuit on a different cause of action." ' [Citation.] [¶] Thus, res judicata does not merely bar relitigation of identical claims or causes of action. Instead, in its collateral estoppel aspect, the doctrine may also preclude a party to prior litigation from redisputing issues therein decided against him, even when those issues bear on different claims raised in a later case." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828, italics omitted.) "Collateral estoppel . . . is

_____

[22] Barella was named in the underlying petition for writ of mandate as a real party in interest. We grant Barella's request that we take judicial notice of this decision. (Evid. Code, §§ 452, subd. (a), 459; Cal. Rules of Court, rule 8.1115(b)(1).)

intended to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation. [Citation.]" (*Id.* at p. 829.) The doctrine is applied " 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]' [Citation.]" (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.)

CARRQ appears to dispute only the identity of issues in the two proceedings. CARRQ insists that *Tresch* only held that the District was not required to analyze Resolution No. 10-0925 permitting use of land subject to the conservation easement under CEQA, and that "[t]he issue here is whether the County . . . was required to analyze the use of the mitigation preserve on [conservation easement] land, as it was clearly proposed in conjunction with the [Quarry] Project." (Italics omitted.)

CARRQ is correct that the reviewing court in *Tresch* rejected appellants' claim that Resolution No. 10-0925 was itself a CEQA project, since it only established that creation of the mitigation preserve is permissible in principle under the existing terms of the conservation easement, and neither required nor permitted any specific action or any physical change to the adjacent property. "All it does is confirm that the terms of the [conservation easement] do not preclude the possibility that the Preserve, in some form, could be established on the [adjacent] property." (*Tresch, supra,* A133472.)

But similar to the argument CARRQ makes here with respect to the Roblar Road mitigation measures, appellants in *Tresch* also argued that the District's adoption of Resolution No. 10-0925 required compliance with CEQA, in part because the mitigation

activity allowed under this resolution is an integral component of the Quarry Project.[23] CARRQ ignores the fact that the underlying petition in *Tresch* sought not only vacation of Resolution No. 10-0925, but an order requiring preparation of a new EIR for the Quarry Project. The *Tresch* court expressly rejected appellants' assertion that Resolution No. 10-0925 was an integral part of the Quarry Project, finding that the mitigation conditions of the final EIR left it up to the federal and state agencies involved to determine what mitigation efforts will be needed in regard to the protected species. "Nothing in [the final EIR conditions of approval] makes establishment of the Preserve inevitable, or (in the words of the CEQA [implementing guidelines]) 'commits the [District . . . ] to a definite course of action in regard to' mitigating the Quarry's impact on the protected species. ([Cal. Code Regs., tit. 14], § 15352.) [¶] . . . Thus, the conditions of the EIR for the Quarry neither included nor relied upon the District's interpretation of the [conservation easement] to permit the Preserve. Moreover, nothing in the record suggests that Barella cannot satisfy the conditions of the EIR as to the protected species without creating the Preserve, if there are other means of sufficiently mitigating the Quarry's effect on the protected species. Thus, both legally and as a practical matter, it is possible for the Quarry [P]roject to go forward even if the Preserve is never created." (*Tresch, supra,* A133472.)

Thus, the issue of whether the site of the proposed protected species mitigation preserve was required to be included in the Quarry Project final EIR was adjudicated in *Tresch* and could not be revisited, either in the trial court or here. This is necessarily dispositive of CARRQ's claim that the County failed to proceed in the manner required by law in this respect.

---

[23] The *Tresch* appellants also contended that to not consider Resolution No. 10-0925 as part of the Quarry Project would allow Barella to establish the preserve without ever complying with CEQA, and that Resolution No. 10-0925 had a reasonably foreseeable indirect impact on the environment due to the possibility that its adoption would set a precedent for the District to interpret other conservation easements to permit use of the underlying land for the benefit of commercial projects.

2.    *Sufficiency of the Mitigation Analysis*

CARRQ is not precluded by collateral estoppel from challenging the adequacy of the mitigation analysis for the protected species measures contained in the final EIR, an issue not considered in *Tresch*. CARRQ contends that even if the mitigation preserve were not required for the Quarry Project to go forward, it was still contemplated as a part of the Quarry Project, and should have at least been analyzed as a mitigation measure or alternative. CARRQ further argues that the EIR deficiently addressed the actual mitigation measures relating to the take of endangered species and that the mitigation measures are improperly vague.

In this instance, Barella may be correct that CARRQ failed to exhaust its administrative remedies. As Barella points out, CARRQ's objections to the mitigation preserve, as reflected in the administrative record, challenged the creation of a mitigation bank on the adjacent parcel as a violation of the a conservation easement on that property prohibiting "any nonagricultural commercial or industrial activity or use" on those lands. (See *Tresch, supra*, A133472.) CARRQ did not appear to raise any environmental impact issues with respect to the mitigation preserve, nor did it directly challenge the sufficiency of the species protection mitigation measures in the administrative proceedings. To challenge findings in an EIR, the basis for alleged noncompliance must be presented to the agency orally or in writing during the public comment period or prior to the close of the public hearing. (Pub. Resources Code, § 21177, subd. (a).) " 'The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body " 'is entitled to learn the contentions of interested parties before litigation is instituted.' " ' [Citation.]" (*California Native Plant Society, supra,* 172 Cal.App.4th at p. 616.) " 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' [Citation.]" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 791–792; *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [failure to present issue at administrative level precludes

judicial review], disapproved on other grounds in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 539.)

Even assuming, however, that the comments submitted by CARRQ are adequate to preserve a challenge here, we would reject the claim on the merits. The final EIR recognized the impacts to two protected species, both during Quarry development and operation, and from a permanent loss of habitat on the Quarry site. CARRQ focuses only on mitigation measures relating to habitat loss, specifically mitigation measure D.11a, complaining that the requirement for consultation with federal and state wildlife authorities fails to identify the criteria which will apply to the habitat replacement, or what evidence would support a conclusion that "these undefined measures will be sufficient to mitigate the significant effects of the project on these listed species." CARRQ contends that this constitutes an improper deferral of mitigation.

Formulation of mitigation measures should not be deferred until some future time. (Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(1)(B).) But mitigation measures are not "deferred" if the agency recognizes the potential environmental effects and articulates specific performance criteria for mitigation of those effects. (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at pp. 1394–1396 [applicant required to submit improvement plans, grading plans, and a final map for approval, that would be "subject to a host of specific performance criteria imposed by various ordinances, codes, and standards, as well as other mitigation conditions"].) "Furthermore, a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance. [Citations.]" (*Oakland Heritage Alliance v. City of Oakland, supra,* 195 Cal.App.4th at p. 906.)

*California Native Plant Society* presented circumstances similar to those before us. A residential and commercial development project was determined to have a significant environmental impact in loss of vernal pool tadpole shrimp habitat. (*California Native Plant Society, supra,* 172 Cal.App.4th at p. 610.) Mitigation measures included requiring the applicant to create an offsite vernal pool and seasonal wetland habitat " 'to ensure no net loss in wetland habitat acreage, values and functions.' " (*Id.* at p. 612.) The project

29

opponent argued the EIR violated CEQA because it " 'failed to describe . . . where off-site vernal pool and wetland creation [would] occur, or how such activities may affect these undescribed off-site environments.' " (*Id*. at p. 614.)  The opponent also contended a city had " 'unlawfully deferred development and adoption of mitigation measures until after project approval' by failing to describe where the offsite mitigation might occur and failing to analyze or disclose the impacts of that mitigation[,]" and that a finding that the mitigation measures "would reduce the impact of the [p]roject on these habitats to less than significant, was not supported by the evidence." (*Ibid*.)  Rejecting a claim that the city had deferred mitigation, the Court of Appeal held that "when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. . . . [¶] . . . The [c]ity did not defer a determination of whether the [p]roject would have a significant impact on the vernal pool and seasonal wetland habitats or defer the identification of measures calculated to mitigate that impact.  Rather, the [c]ity determined the impact the [p]roject would have—habitat loss—and identified a specific measure to mitigate that impact—preservation or creation of replacement habitat offsite in a specific ratio to the habitat lost as a result of the [p]roject. . . . [T]he agency was entitled to rely on the results of a future study to fix the exact details of the implementation of the mitigation measures the agency identified in the EIR." (*Id.* at pp. 621–622.)

The County did exactly that here.  It identified the environmental impact—habitat loss for two protected species—and it required replacement of lost habitat in a manner compliant with federal and state law.  The conditions of approval require identification of replacement habitat, in a ratio "not less than 1:1," for the protected species in accordance with a Biological Opinion to be obtained in consultation with the USFWS, as well as compliance with the California Endangered Species Act.  A site-specific habitat mitigation plan would be determined by the USFWS based on the findings issued in the Biological Opinion, and CTS larval relocation was required to be conducted under the

direction of the USFWS and Department of Fish and Game.  Moreover, the habitat mitigation for the CTS was required to be consistent with existing CTS mitigation measures identified in the 2005 Santa Rosa Plain Conservation Strategy and 2007 USFWS Programmatic Biological Opinion.  CARRQ fails to meet its burden to show that the final EIR is inadequate in this respect.

We find the contested conclusions of the final EIR to be supported by substantial evidence, and the final EIR to be sufficient as an information document.  (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653.)

### III.    DISPOSITION

The judgment granting the petition for writ of mandate is reversed.  The matter is remanded to the trial court with instructions to deny the petition.  Barella shall recover costs on appeal.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Simons, J.