[No. F051508. Fifth Dist. Oct. 2, 2007.]

TUOLUMNE COUNTY CITIZENS FOR RESPONSIBLE GROWTH, INC., Plaintiff and Appellant, v.
CITY OF SONORA et al., Defendants and Respondents;
CALIFORNIA GOLD DEVELOPMENT CORP. et al., Real Parties in Interest and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.–VII. of the DISCUSSION.

**COUNSEL**

Law Office of J. William Yeates, J. William Yeates, Keith G. Wagner and Jason R. Flanders for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

Sheppard, Mullin, Richter & Hampton, Philip F. Atkins-Pattenson, Arthur J. Friedman and Ella Foley-Gannon for Real Parties in Interest and Respondents.

**OPINION**

**DAWSON, J.**—This appeal concerns a proposal to construct a home improvement center in the City of Sonora. A local citizens' organization challenged the approval of the project and the adoption of a mitigated negative declaration by alleging violations of the California Environmental Quality Act (CEQA)[1] and local ordinances. The superior court denied the organization's petition for a writ of mandate.

---

[1] Public Resources Code section 21000 et seq.

The organization appealed, arguing that the whole of the action constituting a single CEQA project was segmented when the realignment of an adjacent road was not treated as part of the home improvement center project. This case is similar to *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712 [117 Cal.Rptr. 96] (*Plan for Arcadia*), where the court found that the construction of (i) a shopping center, (ii) a parking lot, and (iii) improvements to an adjacent street were all part of a single CEQA project. Following the opinion in that case, we conclude as a matter of law that the construction of the home improvement center and the realignment of the road constitute a single CEQA project. As a result, the combined activity should have been analyzed in the same initial environmental study.

Therefore, judgment is reversed and the matter remanded for the issuance of a writ of mandate.

## FACTS AND PROCEEDINGS

*Parties*

Plaintiff and appellant Tuolumne County Citizens for Responsible Growth, Inc. (Responsible Growth), alleged that it is a nonprofit public benefit corporation organized under California law and that its mission includes protecting the greater Sonora, California area's rural quality of life by, among other things, seeking the enforcement of environmental protection laws.

Defendants and respondents City of Sonora, the City Council of the City of Sonora, and the Planning Commission of the City of Sonora (collectively, City) approved the project application for the proposed home improvement center.

Respondents and real parties in interest are (1) California Gold Development Corp., the entity that applied to City for approval of the project (sometimes referred to as applicant); (2) Ray A. Sanguinetti Land Co., L.P.; (3) Sonora Developers, LLC; and (4) Lowe's HIW, Inc., a Washington corporation. For purposes of this opinion, we will refer to the real parties in interest collectively as "Lowe's."

*Project*

In December 2004, Lowe's submitted to City design review, site plan review, and landscape review applications for a new Lowe's home improvement center.

The site for the proposed Lowe's home improvement center is 10.74 acres of land located to the west of old Wards Ferry Road and south of the Sierra Railroad tracks. A Wal-Mart Store is located on the eastern side of Old Wards Ferry Road. The "approved project is to include the construction of a 111,196 square foot building (94,000 square feet of merchandising area), and 27,720 square foot garden center, along with associated parking areas, driveways, landscaping, and off-site street improvements, as illustrated in the revised site plan submitted on May 16, 2005 . . . ."[2]

The initial study indicated the site would be accessed by two driveways connected to Old Wards Ferry Road, "one on the north end of the site near the Sierra Railroad tracks, and one on the south end, adjacent to the State Highway 108 right-of-way, to primarily serve truck traffic needs."

The initial study also stated that "Old Wards Ferry Road will be realigned across the adjacent parcel to the north to create a four way intersection with Sanguinetti and Greenley Roads, in accordance with local and regional street and road improvements previously identified by the City [of Sonora] and the Tuolumne County Transportation Commission." Moving a portion of Old Wards Ferry Road to the west, so that it aligns with Greenley Road and creates a four-way intersection at Sanguinetti Road, would require that Old Wards Ferry Road cross the Sierra Railroad to the west of the existing crossing.

On March 11, 2005, City published a notice of intent to adopt a mitigated negative declaration that stated a 20-day public review period began on March 14, 2005, and ended on April 3, 2005. City circulated a proposed initial study, mitigated negative declaration, and mitigation monitoring and reporting plan.

After receiving comments from the public and additional information from Lowe's, City revised the mitigated negative declaration. City determined that recirculation of the final mitigated negative declaration was not necessary.

At its June 30, 2005, special meeting, the planning commission of City approved the application for design and site plan review submitted for the home improvement center project and adopted the mitigated negative declaration. The approval was subject to a number of conditions, some of which

---

[2] This description of the project is from an attachment to a memorandum the community development director prepared for the June 30, 2005, special meeting of City's planning commission.

concerned Old Wards Ferry Road. One of the conditions required an encroachment plan, approved by the city engineer, for access to and from the site using Old Wards Ferry Road. Condition No. 4 provided: "In addition to the encroachment plan to Old Wards Ferry Road, and associated improvements, the following street and road improvements shall also be completed prior to the commencement of business operations by Lowe's: [¶] . . . Realignment of the intersection of Old Wards Ferry/Sanguinetti/Greenley Roads, along with relocation of the Sierra Railroad crossing of Old Wards Ferry Road to P[ublic Utility Commission] standards. [¶] . . . Signalization at the intersection of Old Wards Ferry/Sanguinetti/Greenley Roads, linked to the signal at Mono Way/Greenley Road. [¶] . . . An offer of dedication of right-of-way across the north side of the project site related to the City's study of an alternative east-west route. [¶] . . . A financial contribution to the County of Tuolumne of twelve percent (12%) of costs for restriping, signing and widening associated with the Mono Way/Sanguinetti Loop intersection."

On July 11, 2005, Responsible Growth appealed the planning commission's approval of the home improvement center project to the city council. The city council held a special meeting on July 20, 2005, to consider the appeal. The matter was continued to July 28, 2005. On that date, the city council denied Responsible Growth's appeal, adopted the revised mitigated negative declaration, and approved the home improvement center project.

City filed a notice of determination on August 1, 2005. Later that month, Responsible Growth filed a petition for writ of mandate that alleged the approval of the project for the construction of a Lowe's home improvement center violated CEQA and local ordinances.

On May 1, 2006, the superior court held a hearing on the petition for writ of mandate. In August 2006, the superior court signed and filed a 26-page statement of decision that denied the petition in all respects. Judgment in favor of City and Lowe's was filed on August 24, 2006. Responsible Growth filed a timely notice of appeal in October 2006.

*Requests for Judicial Notice*

Responsible Growth's first motion requesting judicial notice, filed on February 27, 2007, includes four documents: exhibits 1 through 4. Exhibit 1 is chapter 17.42 of the Sonora Municipal Code, titled "Parking and Loading." (See pt. VII.A., *post.*) Exhibits 2 through 4 are documents related to the realignment of a portion of Old Wards Ferry Road.

Lowe's joint motion for judicial notice filed on April 9, 2007, includes eight documents: exhibits A through H. Exhibit C is chapter 17.42 of the Sonora Municipal Code, which also is exhibit 1 in Responsible Growth's motion.

Responsible Growth's opposition was filed on April 17, 2007, and does not oppose judicial notice of exhibits A through G, but does oppose judicial notice of exhibit H, a resolution of the Tuolumne County Transportation Council, which did not exist at the time City approved Lowe's proposed project.[3]

We grant Responsible Growth's first motion requesting judicial notice and Lowe's joint motion for judicial notice so that we have a better picture of the issues that will confront the superior court on remand. Responsible Growth's second motion requesting judicial notice filed on July 12, 2007, is denied.

## DISCUSSION

### I. *Scope of the Project*

#### A. *Contentions of the parties*

The parties disagree over whether the proposed home improvement center and the realignment of Old Wards Ferry Road are part of a single "project" for purposes of CEQA. (See Pub. Resources Code, § 21065 [definition of "project"]; Cal. Code Regs., tit. 14, § 15378, subd. (a) [same].)[4] Responsible Growth contends the two endeavors are part of the whole of a single CEQA project, and City thus violated CEQA by finding it was unnecessary to consider the realignment of Old Wards Ferry Road in the mitigated negative declaration prepared for the home improvement center project.

Lowe's disagrees. It contends that (1) City properly evaluated the whole of the home improvement center project and (2) substantial evidence shows that the road realignment project was a longstanding, separate City project. Furthermore, according to Lowe's, City's determination does not mean environmental review of the road realignment project has been avoided because that project is undergoing a separate CEQA review.

---

[3] The superior court took judicial notice of this resolution and, as a result, it already was part of the appellate record.

[4] Further references to California Code of Regulations, title 14, section 15000 et seq. shall be to the Guidelines.

### B. *Statutory and regulatory provisions that define "project"*

CEQA requires public agencies to undertake an environmental review of proposed projects that require their discretionary approval. (Pub. Resources Code, § 21080, subd. (a).) Consequently, the determination of the scope of the project is an important step in complying with the mandates of CEQA.

CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . . [¶] . . . [¶] . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

The statutory definition is augmented by the Guidelines, which define a "project" as *"the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a), italics added; see Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) pp. 75–77 ["whole of an action" requirement].) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).)

The scope of the environmental review conducted for the initial study must include the entire project. Specifically, "[a]ll phases of project planning, implementation, and operation must be considered in the initial study of the project." (Guidelines, § 15063, subd. (a)(1).)

### C. *Policies that influence the definition of a project*

The California Supreme Court has considered how to interpret the word "project" and concluded that CEQA is "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896–897 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Based on this guidance

from the California Supreme Court and the policies identified by the Legislature in Public Resources Code sections 21000 and 21001, the Court of Appeal has given the term "project" a broad interpretation and application to maximize protection of the environment. (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1189 [61 Cal.Rptr.2d 447]; see *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653 [54 Cal.Rptr.3d 500] [this court stated "CEQA's conception of a project is broad"].) This broad interpretation ensures that "the requirements of CEQA 'cannot be avoided by chopping up proposed projects into bite-size pieces' which, when taken individually, may have no significant adverse effect on the environment ([*Plan for Arcadia, supra,*] 42 Cal.App.3d 712, 726 . . .) . . . ." (*Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854 [139 Cal.Rptr. 176].)

### D. *Question of fact or question of law*

A fundamental dispute between the parties is whether City's decision about the scope of the home improvement center project is reviewed as a question of fact or as a question of law. Lowe's argues that the question is factual in nature and, thus, reviewed under the substantial evidence standard.

It is well established that "[w]hether an activity is a project is an issue of law that can be decided on undisputed data in the record on appeal. [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382 [60 Cal.Rptr.3d 247, 160 P.3d 116]; see *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist., supra,* 147 Cal.App.4th at p. 653.) That proposition, however, does not answer a preliminary question.

Before the question whether an *activity* is a *project* can be addressed, the question concerning which acts to include and exclude from the scope of the *activity* must be answered.[5] Which acts, that is, constitute the "whole of an action" for purposes of determining the scope of a potential project? (Guidelines, § 15378, subd. (a) [term "project" encompasses "whole of an action" affecting environment].)

A number of published decisions have stated that the question whether an activity is a project is one of law subject to independent review by an appellate court. (E.g., *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 637 [10 Cal.Rptr.3d

---

[5] We have italicized words in this sentence to emphasize that they are statutory terms. (See Pub. Resources Code, § 21065.)

560] (*ACE*); *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984 [28 Cal.Rptr.2d 305] ["[w]hether a particular activity constitutes a project in the first instance is a question of law"].)

In contrast, it appears that no published opinion has yet addressed explicitly the question whether a determination of the scope of an activity is reviewed as either a question of law or a question of fact. This court has, however, ruled by implication that the question is one of law. (*ACE, supra*, 116 Cal.App.4th at pp. 637–638.)

In *ACE*, we addressed "what actions should be considered as part of the potential [CEQA] project" in a case involving the closure of a community college's shooting range. (*ACE, supra*, 116 Cal.App.4th at p. 638.) We determined that the closure and removal of the shooting range, the cleanup activity, and the transfer of the operations previously conducted there to other facilities were all part of a single, coordinated endeavor undertaken by the community college. (*Id.* at p. 639.) As a result, we concluded that those acts were part of "the whole of an action" by the community college for purposes of Guidelines section 15378. (*ACE, supra*, at pp. 638–639.) We reached this conclusion based on an independent review of the evidence in the record. We did not apply the substantial evidence test to the agency's determination or otherwise defer to its determination. (See *id.* at pp. 637–639.)

▪ Accordingly, absent contrary authority, we take the same approach taken in *ACE* and conclude that the question concerning which acts constitute the "whole of an action" for purposes of Guidelines section 15378 is a question of law that appellate courts independently decide based on the undisputed facts in the record.

E. *Undisputed facts in the record*

Lowe's has not argued explicitly that there are insufficient undisputed facts in the record for this court to determine the scope of the whole of its action as a matter of law. Nevertheless, we will treat such an argument as implicit in Lowe's position that a question of fact was resolved by City.

F. *Scope of the home improvement center project*

The parties approach the scope of the home improvement center project from different perspectives. Responsible Growth emphasizes the "whole of an action" language in Guidelines section 15378 and the connections between the home improvement center project and the road realignment. In contrast, Lowe's emphasizes the age and historical independence of the plan to realign Old Wards Ferry Road.

### 1. *Case law concerning building projects and adjacent roadwork*

We begin by comparing the facts of this case to the facts of a case with significant similarities—*Plan for Arcadia, supra,* 42 Cal.App.3d 712, where the Court of Appeal addressed whether the construction of a shopping center, a parking lot, and improvements to an adjacent street were all part of a single CEQA project. The court stated it was clear "that the shopping center and parking lot projects together with the widening of the southern portion of Baldwin Avenue are related to each other and that in assessing their environmental impact they should be regarded as a single project under [CEQA]." (*Plan for Arcadia, supra,* 42 Cal.App.3d at p. 726.) In contrast, the court also determined that the widening of the northern portion of Baldwin Avenue was a separate CEQA project. (42 Cal.App.3d at pp. 724–725.) Consequently, in this case, we examine whether the road realignment is more like the widening of the northern portion of Baldwin Avenue or the widening of the southern portion.

In the 1960's, the City of Arcadia determined that the completion of the Foothill Freeway would cause Baldwin Avenue to receive more traffic and that, eventually, it would need to be improved to safely accommodate the increased traffic. (*Plan for Arcadia, supra,* 42 Cal.App.3d at p. 720.) In 1970, the developer applied for a zoning change to allow the construction of a major regional shopping center, Fashion Park. (*Id.* at p. 718.) The city's voters approved the zoning change in April 1971. "When the Fashion Park applications were under consideration the city determined that additional traffic generated by the shopping center could be accommodated by the widening [of Baldwin Avenue] already requested because of the freeway." (*Id.* at p. 720.) The city saved itself part of the cost of widening the avenue by requiring the developer to commit itself to paying for widening the portion adjacent to the shopping center—that is, the southern portion. (*Ibid.*) In March 1972, the city council included the widening of the northern portion in a six-year capital improvement plan and subsequently conducted a separate environmental review of that part of the widening of Baldwin Avenue. (*Id.* at pp. 720–721.)

In *Plan for Arcadia,* the Court of Appeal referenced two facts to support the conclusion that the widening of the northern portion of Baldwin Avenue was not part of the project that included building the shopping center and parking lot and widening the southern portion of Baldwin Avenue. First, the city had determined long before the application for the zoning change that the completion of the freeway would require the widening of Baldwin Avenue. Second, the widening of the northern portion was a municipal capital improvement project, not a private project. (*Plan for Arcadia, supra,* 42 Cal.App.3d at p. 724.)

In contrast to these two facts, the widening of the southern portion of Baldwin Avenue "was a condition of the Fashion Park development . . . ." (*Plan for Arcadia, supra*, 42 Cal.App.3d at p. 723, fn. 5.) Also, the developer had committed to paying for it. (*Id.* at p. 720.) Consequently, the court concluded that the building of the shopping center and parking lot and the widening of the southern portion of Baldwin Avenue were "related to each other" and "should be regarded as a single project" under CEQA. (*Plan for Arcadia, supra*, at p. 726.)

The realignment of Old Wards Ferry Road is similar to the widening of the southern portion of Baldwin Avenue in two important ways. First, the approval of the home improvement center project is conditioned upon completion of the road realignment. Second, Lowe's has committed to funding and completing the road realignment.[6] These two similarities are more significant than the one similarity between the realignment of Old Wards Ferry Road and the widening of the northern portion of Baldwin Avenue—the long-existing plan for the work. Consequently, there is a strong connection between the road realignment and the completion of the proposed home improvement center. It follows that our decision will be consistent with *Plan for Arcadia* only if we conclude that the home improvement center project and the road realignment are part of a single CEQA project. (Cf. *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] [acts related to development of shopping center were single project; use of two negative declarations overturned on appeal].)

2. *Application of general principles*

Before following the result reached in *Plan for Arcadia*, we test that result by applying some of the general principles used to determine whether a particular act is part of the activity that constitutes a CEQA project.

 One way to evaluate which acts are part of a project is to examine how closely related the acts are to the overall objective of the project. The relationship between the particular act and the remainder of the project is sufficiently close when the proposed physical act is among the "various steps which taken together obtain an objective." (Robie et al., Cal. Civil Practice—Environmental Litigation (2005) § 8.7.)

---

[6] These facts are undisputed and, together with the other undisputed facts, allow us to determine the scope of the project as a matter of law.

In this case, Lowe's objective is to open and operate a home improvement center in Sonora. The commencement of business operations at the site is conditioned upon the completion of the realignment of Old Wards Ferry Road. As a result, the road realignment is a step that Lowe's must take to achieve its objective. In this regard, we note that Lowe's has cited no case or other authority for the proposition that a condition or mitigation measure is not part of the project to which it is attached.

■ In addition, the road realignment and the proposed home improvement center are related in (1) time, (2) physical location and (3) the entity undertaking the action. As to timing, the road alignment must be completed before business operations at the home improvement center may begin. With respect to the physical location, the activities are next to one another. Furthermore, the realignment of the road will be undertaken by the project proponents,[7] which also will be making other changes to Old Wards Ferry Road. When two acts are closely connected in time and location, the potential for related physical changes to the environment in that location is greater than otherwise. Thus, the need for a single review of the environmental impact of the two acts is greater. Also, when the same entity undertakes both matters, it increases the likelihood that the matters are related—that is, are part of a larger whole.

In summary, the various connections between the road realignment and the proposed home improvement center compel us to conclude that they are related acts that constitute a single CEQA project.

### 3. *Separate and independent*

City has long recognized the advantages of aligning Old Wards Ferry Road with Greenley Road so that a four-way intersection is created at Sanguinetti Road. City's community development director testified at the July 28, 2005, city council hearing that "it has been a separate and distinct project for over twenty years, as far as it relates to the City." He further testified that the realignment is shown in the 1984 general plan circulation element and in

---

[7] Lowe's appellate brief states that the only connection between the home improvement center project and the road realignment "arises from the fact that the developer agreed to construct this longstanding road realignment project, once it is approved by the City and the PUC [California Public Utilities Commission], in lieu of paying the City's traffic mitigation fees for the [home improvement center] Project." Therefore, the parties do not dispute who will do the physical work associated with the road realignment.

City's redevelopment plan as a regional road improvement. Also, "this intersection and roadway realignment has been part of our local road program under the traffic impact fee program for quite sometime [*sic*] . . . ."

Lowe's contends the foregoing testimony is part of the substantial evidence that supports City's finding that the road realignment is separate and independent from the home improvement center project.[8] Lowe's presents three arguments to support this position.

■ First, Lowe's contends the developer only sought approval to construct the Lowe's facility and did not seek approval of the road realignment. The Guidelines, however, establish that the need for separate approvals does not sever all of the connections between the two acts. (See Guidelines, § 15378, subd. (c) [separate governmental approvals do not create separate projects].) The acts remained connected, notwithstanding the separate approvals, because the road realignment is a condition that must be completed by the developer of the home improvement center before that center may commence business.

■ Second, Lowe's argues the road realignment is separate because it is not necessitated by the home improvement center project. Lowe's asserts the need for the road realignment was caused by regional traffic conditions and cumulative impacts associated with growth and development throughout Sonora. Case law requires that the term "project" be given a broad interpretation and application. We reject the position that a CEQA project excludes an activity *that actually will be undertaken* if the need for that activity was not fully attributable to the project as originally proposed. The "necessitated by" test is best applied in cases that consider whether a potential future action is sufficiently certain to occur to justify its inclusion in the scope of the activity that might constitute a CEQA project. (See *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist., supra*, 147 Cal.App.4th at p. 659.) When the situation involves action that actually will be taken to complete the project as proposed, the "necessitated by" test is a far too narrow standard for determining the scope of the project. For example, it is contrary to the broader "related to" language used by the Court of Appeal in *Plan for Arcadia, supra*, 42 Cal.App.3d at page 726, and the "whole of an action" language used in Guidelines section 15378. Also, it is inconsistent with the inquiry into whether the act is a step taken towards the achievement of an objective—that is, whether the act is part of a coordinated endeavor. (See *ACE, supra*, 116 Cal.App.4th at p. 639 [series of acts all part of single, coordinated endeavor].)

---

[8] Consistent with our earlier decisions regarding the role of an appellate court in ascertaining the scope of a project, we conclude that the issues of separateness and independence present issues that can be determined as a matter of law from the undisputed facts of this case.

Third, Lowe's contends that the home improvement center project and the road realignment "are not integral," because they could "be implemented independently of each other." Based on this contention, Lowe's concludes that the two undertakings are not part of a single CEQA project. We reject this argument for two reasons.

■ First, Lowe's has misstated how the concept of integral parts is used to determine the scope of a CEQA project. We accept the following as an accurate statement of law: "Courts have considered separate activities as one CEQA project and required them to be reviewed together where . . . both activities are integral parts of the same project (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223 [242 Cal.Rptr. 37])." (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698 [27 Cal.Rptr.3d 223] (*West Side Irrigation*).) Thus, when one activity is an integral part of another activity, the combined activities are within the scope of the same CEQA project. Lowe's goes astray, however, by inverting this principle. The idea that all integral activities are part of the same CEQA project does not establish that *only* integral activities are part of the same CEQA project.[9]

Second, we disagree with Lowe's definition of the term "integral." According to Lowe's appellate brief, acts "are not integral" if they "can be implemented independently of each other." Lowe's definition appears to be taken from language used by the Court of Appeal in *West Side Irrigation*, *supra*, 128 Cal.App.4th 690. In that case, a city entered into agreements for the assignment of water rights with two different districts. The court concluded the agreements were not part of the same CEQA project and supported its conclusion by stating: "The initial studies stated the assignments were not interrelated and *could be implemented independently of each other*. Neither was contingent on the other. The assignments involve separate water rights; they transfer different amounts of water; and they occur under separately negotiated agreements that contain different terms from each other." (*West Side Irrigation*, *supra*, 128 Cal.App.4th at pp. 699–700, italics added.)

Lowe's reliance on the italicized language has many flaws. The sentence containing the italicized language, for example, does not purport to define the term "integral." That term is defined as "of, relating to, or serving to form a whole: essential *to* completeness . . . ." (Webster's 3d New Internat.

---

[9] Stated more generally, Lowe's error in logic was treating a sufficient condition as a necessary condition.

Dict. (1986) p. 1173.) Based on this definition's reference to "a whole," we conclude that the question whether an activity is an "integral" part of a CEQA project merely restates the question whether that activity is part of the "whole of an action" for purposes of Guidelines section 15378, subdivision (a).[10]

Another flaw in using the italicized language to define "integral" is the phrase "could be." This phrase, it seems to us, places too much importance on theoretical possibilities at the expense of what actually is happening. In other words, the possibility that two acts could be taken independently of each other is not as important as whether they actually will be implemented independently of each other.

Theoretical independence is not a good reason for segmenting the environmental analysis of the two matters. Doing so runs the risk that some environmental impacts produced by the way the two matters combine or interact might not be analyzed in the separate environmental reviews. Furthermore, if the two matters are analyzed in sequence (which was the situation here) and the combined or interactive environmental effects are not fully recognized until the review of the second matter, the opportunity to implement effective mitigation measures as part of the first matter may be lost. This could result in mitigation measures being adopted in the second matter that are less effective than what would have been adopted if the matters had been analyzed as a single project.

An additional flaw in using the phrase "could be implemented independently of each other" as a complete definition of the term "integral" is that the sentence from which it was taken mentioned a second factor—whether the activities were "interrelated." (*West Side Irrigation, supra,* 128 Cal.App.4th at p. 699; cf. *Plan for Arcadia, supra,* 42 Cal.App.3d at p. 726 [using "related to" to describe activity that was part of CEQA project].) Similarly, the paragraph containing the italicized language mentioned additional factors relevant to the court's decision. The court explicitly recognized that the implementation of one assignment was not contingent upon the implementation of the other. (*West Side Irrigation, supra,* at p. 699.)

In summary, we recognize that it was theoretically possible that the home improvement center project could have been completed without the comple-

---

[10] An implication of this conclusion is that the courts have not used the term "integral" to narrow, by judicial fiat, the Guidelines' definition of the term "project."

tion of the road realignment. Nevertheless, that project cannot be completed and opened legally without the completion of the road realignment. Their independence was brought to an end when the road realignment was added as a condition to the approval of the home improvement center project. (See *Plan for Arcadia, supra,* 42 Cal.App.3d at p. 726 [referencing factual and legal separateness of widening northern portion of Baldwin Avenue].) At that point in time, the independent existence of the two actions ceased for purposes of CEQA and the road realignment became "a contemplated future part of" completing the home improvement center. (*West Side Irrigation, supra,* 128 Cal.App.4th at p. 699.)

### 4. *Conclusion*

The undisputed facts in the record show that the realignment of Old Wards Ferry Road and the home improvement center project are part of the whole of the action to be undertaken by Lowe's. Stated otherwise, the home improvement center project is dependent upon, not independent of, the road realignment because the opening of the home improvement center was conditioned upon the completion of the road realignment. Therefore, we conclude the two acts are part of a single project for purposes of CEQA. City violated CEQA by treating them as separate projects subject to separate environmental reviews.

On remand, City and Lowe's must comply with the following requirement: "All phases of project planning, implementation, and operation must be considered in the initial study of the project." (Guidelines, § 15063, subd. (a)(1).)

II.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions to vacate its order denying the petition for writ of mandate and to enter a new order that (1) denies the seventh cause of action and (2) grants the petition for writ of mandate and directs City to (a) set aside the resolution or decision adopting the mitigated negative declaration, (b) set aside the resolution or decisionmaking findings under CEQA in connection with its approval of the project, (c) set aside the resolution or decision

---

*See footnote, *ante,* page 1214.

approving the project,[23] (d) complete an environmental evaluation of the entire CEQA project and (e) generate appropriate environmental review documents.[24] The superior court shall retain jurisdiction over the proceedings by way of a return to the writ.[25]

Costs on appeal are awarded to Responsible Growth.

Vartabedian, Acting P. J., and Harris, J., concurred.

On October 31, 2007, the opinion was modified to read as printed above.

---

[23] In *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1200 [31 Cal.Rptr. 3d 901], the city's failure to consider the whole of the project compelled the Court of Appeal to overturn the city's adoption of a negative declaration.

[24] We do not presume the appropriate documents will be (1) an initial study and related mitigation negative declaration or (2) an initial study and enviromental impact report.

In addition, our disposition of this appeal should not be construed to require City to exercise its lawful discretion in a particular way. (Pub. Resources Code, § 21168.9, subd. (c).)

The issue whether any or all specific project activity should be suspended or enjoined in accordance with the terms of Public Resources Code section 21168.9, subdivision (a)(2) is best addressed by the superior court on remand. Certain findings are required which cannot be made on the record before this court.

[25] This statutory requirement is set forth in Public Resources Code section 21168.9, subdivision (b). (E.g., *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1637 [27 Cal.Rptr.3d 28] [superior court directed to require public agency to respond to writ by filing a return].)