Filed 8/23/22  Joshua v. San Francisquito Creek Joint Powers Authority CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER JOSHUA,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISQUITO CREEK JOINT POWERS AUTHORITY, et al.,<br><br>      Defendants and Respondents. | A163294<br><br>(San Mateo County<br>Super. Ct. No. 19CIV06305) |

Appellant Peter Joshua filed an unsuccessful petition for a writ of mandamus alleging that the San Francisquito Creek Joint Powers Authority (SFCJPA) failed to comply with the California Environmental Quality Act (Pub. Res. Code, § 21000 et seq.) (CEQA) in preparing an Environmental Impact Report (EIR) in connection with a project to make certain improvements to protect from floods in the San Francisquito creek watershed (the project).  He argues that the EIR failed to consider a reasonable range of alternatives to the project because certain alternatives were part of the SFCJPA's overall program, that another alternative considered in the EIR was invalid because it did not lessen the environmental impacts of the project, and that the statement of overriding considerations adopted by the

1

SFCJPA failed to find certain of the alternatives infeasible. We reject the arguments, and we affirm.

## BACKGROUND

Against a history of flooding, the SFCJPA developed the "San Francisquito Creek Flood Protection, Ecosystem Restoration, and Recreation Project Upstream of Highway 101." And, following rigorous CEQA review, the project culminated in a lengthy EIR, which EIR provided an excellent background of the setting here. We thus begin with extensive quotation from that EIR:

"San Francisquito Creek originates in the eastern foothills of the Santa Cruz Mountains and drains a watershed that is approximately 45 square miles in size, from Skyline Boulevard to San Francisco Bay. The watershed contains three reservoirs (Searsville, Lagunita, and Felt) and several tributary creeks, including Los Trancos, West Union, Alambique, Bear, and Corte Madera Creek as well as many smaller tributaries that drain into the creeks. San Francisquito Creek begins at the confluence of Corte Madera Creek and Bear Creek, just downstream of Searsville Dam, and flows through Stanford University and the communities of Menlo Park, Palo Alto, and East Palo Alto to San Francisco Bay. San Francisquito Creek represents the boundary between Santa Clara and San Mateo Counties and the cities of Menlo Park, Palo Alto, and East Palo Alto. The watershed's 5-square-mile floodplain is located primarily within these cities."

"For this Program EIR, San Francisquito Creek is described in three reaches (Figure 1-2). Reach 1 extends from San Francisco Bay to the upstream side of U.S. Highway 101. SFCJPA has completed construction of improvements in Reach 1 following the completion of CEQA documentation in 2012. This Program EIR does not include proposed actions in Reach 1,

2

though the upstream end of Reach 1 may be traversed for construction access to a channel-widening site within Reach 2 (Site 5). Reach 2 extends from the upstream side of the frontage road to U.S. Highway 101 (West Bayshore Road) to the upstream side of the Pope-Chaucer Bridge. Reach 3 begins on the upstream side of the Pope-Chaucer Bridge and extends throughout the upper watershed."

"Flooding from the creek is a common occurrence, including twice within the past decade. The largest flow recorded since [record keeping] began in 1930 occurred in February 1998, when the creek overtopped its banks in several areas, affecting approximately 1,700 . . . propert[ies.]" That event is now considered by SFCJPA and the Corps to have been approximately "a 70-year flood, [relative] to the commonly referenced [standard of a] 100-year flood event.[1]"

The EIR thus described the specific objectives of the project as follows:

"Protect life, property, and infrastructure from floodwaters exiting the creek during flows up to 7,500 cubic feet per second (cfs), while minimizing impacts of the project on adjacent communities and the environment;

"Enhance habitat within the project area, particularly interconnected habitat for threatened and endangered species;

"Create new recreational opportunities and connect to existing bike and pedestrian corridors;

"Minimize operational and maintenance requirements; and

"Not preclude future actions to bring cumulative flood protection up to a 100-year flow event."

---

[1] The 100-year flood is considered to have a 1 percent chance of occurring in any given year.

3

The EIR explained how the SFJCPA evaluated the project and various alternatives to it, including the following regarding how the process began with a list of 17 potential projects:

"For the past two decades, members of the public, local agency staff members, and the U.S. Army Corps of Engineers have been analyzing the capital improvements necessary to protect communities within the flood-prone Reach 2 of San Francisquito Creek, upstream of U.S. Highway 101. The three fundamental approaches to providing flood protection—contain, detain, or bypass—with the specific alternatives proposed for analysis, include:

"Enable the creek to contain higher flows during storms by removing constrictions or raising the height of the creek bank in the floodplain area (Alternatives 2, 5, 6, 7, 8, 10, 11, 12, and 17),

"Temporarily detain or store portions of high flows during storms through one or more floodwater detention facilities in Reach 3 (Alternatives 3, 9, 13, and 16), and/or

"Remove a portion of the high flows immediately upstream of Reach 2, route that portion of the flow through the flood-prone area in an underground bypass channel, and deposit this water at a location in the creek that can safely convey it to San Francisco Bay (Alternatives 4, 14, and 15)."

The SFJCPA went on to screen the 17 alternatives as follows:

"Alternatives 2 through 17 were evaluated using a two-round approach. In Round 1 (Table 2-1), alternatives were evaluated for their ability to meet the project objectives. None of the alternatives would preclude future actions to bring cumulative flood protection up to a 100-year flood event and therefore this objective was not evaluated. Alternatives that could not

4

achieve project objectives were excluded from further consideration (i.e., screened out). The alternatives that could potentially meet project objectives were subject to feasibility evaluation in Round 2 (Table 2-2)."

"The previous screening process examined how well each of the 17 alternatives met the project objectives, and then the cost, and logistical and technical feasibility, of the remaining alternatives.

"The following alternatives advanced through this screening process:

"Alternative 2: Replace the Pope-Chaucer Bridge and Widen Channel Downstream.

"Alternative 3: Construct One or More Detention Basins.

"Alternative 5: Replace the Pope-Chaucer Bridge and Construct Floodwalls Downstream.

"As described below, these alternatives were grouped according to the reaches in which they primarily occur, then re-organized and renamed. This EIR analyzes Alternative 3 (from this point forward referred to separately as the Former Nursery Detention Basin Alternative and the Webb Ranch Detention Basin Alternative) at a programmatic level because, in concert with the alternatives proposed in Reach 2, they would help to the overall objective of protecting people and property from water resulting from at least a 100-year event by increasing the conveyance and/or detention of water. Additionally, this EIR conducts a more detailed project level analysis for Alternative 2 and Alternative 5 to enable the implementation of the first phase of work immediately upstream of the highway to allow the creek to contain (and thus protect communities there from) flows up to the 1998 flood event level. These alternatives also advance local priorities of enhancing creek habitat and recreational opportunities."

"Within Reach 2, Alternatives 2 and 5 advanced for full analysis in the EIR. Alternative 2 was renamed the Channel Widening Alternative, and Alternative 5 was renamed the Floodwalls Alternative. Both alternatives include replacing the Pope-Chaucer Bridge and widening the channel immediately upstream of U.S. Highway 101 (Site 5) to align the channel with the recently completed modifications to the bridge at the highway's West Bayshore frontage road. Where Alternatives 2 and 5 differ is in how they achieve flood protection between those two locations. The Channel Widening Alternative would involve primarily creek channel widening, replacing decades-old sacked concrete walls with more vertical, architecturally treated soil nail walls or sheet pile walls. The Floodwalls Alternative would involve construction of floodwalls at the top of the creek's banks. Finally, both alternatives would include construction of creekside parks and aquatic habitat enhancements and potentially creekside parks (Figures 2-1 and 2-2)."

"Within Reach 3, Alternative 3 advanced for full analysis in the Program EIR. Alternative 3 was split into two alternatives, each representing one of the two potential detention basin sites. The potential detention basin at the previous site of Boething plant nursery is called the Former Nursery Detention Basin Alternative and the potential detention basin at Webb Ranch is called the Webb Ranch Detention Basin Alternative."

And so the EIR went to fully analyze 5 potential projects: the statutorily-required "No-Project" alternative, the Channel Widening Alternative, the Floodwalls Alternative, and two detention basin alternatives: the Former Nursery Detention Basin Alternative and the Webb Ranch Detention Basin Alternative. Based on this analysis, the EIR deemed the Channel Widening Alternative the "Preferred Project," and adopted the

following statement of overriding considerations recommending that it be approved:

"In light of the environmental, social, economic, and other considerations identified below and supported by the substantial evidence in the EIR, the SFCJPA chooses to approve the proposed project because, in its view, such benefits substantially outweigh the significant and unavoidable adverse environmental effects. The following statements identify the reasons why, in the SFCJPA's judgment, the benefits of the project outweigh the significant and unavoidable effects. Each of the overriding considerations set forth below constitutes a separate and independent ground for finding that the benefits of the project outweigh its significant adverse environmental effects and is an overriding consideration warranting approval:

"1. The proposed project would restore San Francisquito Creek to its natural capacity throughout the project reach; this improved hydrologic functioning provides long-term benefits to aquatic species.

"2. The proposed project would restore aquatic habitat by installing permanent woody debris, boulders, pools, and other features to approximately 1,800 linear feet of the channel at widening sites and the Pope-Chaucer Bridge. These elements, together with the improvements in hydrologic function in the project reach, will provide long-term benefits to salmonids and other aquatic species.

"3. The proposed project will provide flood protection benefits to over 4,000 homes, businesses, and schools in the San Francisquito Creek floodplain. Although implementation of this project by itself will not completely remove the affected area from the FEMA 100-year flood zone, it will protect life, property, and infrastructure from the largest recorded flood

7

flow and reduce damages during higher flows. Thus, it is a key piece of SFCJPA's long-term comprehensive flood protection strategy.

"4. The proposed project will create recreational opportunities by connecting the new features to existing bike and pedestrian corridors and potentially constructing two creekside parks.

"In summary, in consideration of the existing flood risks along San Francisquito Creek associated with lack of adequate capacity in the Creek channel, and the analysis of project outcomes presented in the Final EIR, SFCJPA finds that the economic, social, and environmental benefits of meeting the project's goals and objectives outweigh the significant and unavoidable noise and cumulative air quality impacts associated with the project's construction."

At a public meeting on September 26, 2019, the SFCJPA certified the EIR, adopted the statement of overriding considerations, and approved the project.

On October 24, Joshua filed a petition for writ of mandamus challenging that approval, alleging a single cause of action for alleged violations of CEQA.

The petition came on for hearing on March 25, 2021, at the conclusion of which the trial court took the matter under submission. On June 4, the trial court issued an order denying the writ petition in its entirety. Judgment was entered on July 9, from which    Joshua filed a notice of appeal.

## DISCUSSION

### Applicable Law

"As a general proposition, CEQA depends on the EIR. 'An environmental impact report is an informational document,' the purpose of

8

which 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (Pub. Resources Code, § 21061.)[2]  According to our Supreme Court: 'The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting " 'not only the environment but also informed self-government.' " [Citation.]  The EIR is the heart of CEQA, and the mitigation and alternatives discussion forms the core of [an] EIR.' (*In re Bay–Delta Etc.* (2008) 43 Cal.4th 1143, 1162.)" (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 724–725 (*Tiburon Open Space*).)

"The judicial attitude to EIRs is deferential.  'A court's task is not to . . . determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated.  We have neither the resources nor [the] scientific expertise to engage in such analysis . . . .' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988)] 47 Cal.3d 376, 393.)  It follows that courts 'do not require technical perfection or scientific certainty.' (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515.)

---

[2] "Statutory references are to this code unless otherwise indicated. . . . We will abbreviate citations to the regulations promulgated by the Secretary of the Natural Resources Agency found in title 14 of the California Code of Regulations beginning at section 15000, as 'Guidelines' which, we have noted, 'are binding upon all state and local agencies in applying CEQA.' (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1256, fn. 12.)"

"The scope of judicial scrutiny proceeds along two paths. ' "Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' As a result of this standard, 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" [Citation.] "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." [Citation.] [¶] "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." [Citation.]' (*In re Bay–Delta Etc.*, *supra*, 43 Cal.4th 1143, 1161–1162.)

" 'The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. . . . "A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." [Citation.] "[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary

10

evidence, we presume regular performance of official duty. (Evid. Code, § 664.)" ' (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918–919.)

"Every court 'presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.) Conversely, courts refuse to presume administrative error, still less that it is prejudicial. (§ 21005, subd. (b).) In fact, 'errors in the CEQA . . . process which are insubstantial or de minimis are not prejudicial.' (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 486; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 ['Insubstantial or merely technical omissions are not grounds for relief'].)

"Legal error, in the form of failure to comply with CEQA, is reviewed independently, but all factual determinations are reviewed according to the substantial evidence standard. 'The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions.' (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)" (*Tiburon Open Space, supra,* 78 Cal.App.5th at pp. 727–728, fn. omitted.)

The range of alternatives included in an EIR must be "potentially feasible alternatives that will foster informed decisionmaking and public participation." (Guidelines, § 15126, subd. (a).) "An EIR shall describe a range of reasonable alternatives to the project . . . which would feasibly attain

most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (*Ibid.*; see *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1350.)

" 'Both the California and the federal courts have further declared that "[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason." ' ([*Citizens of*] *Goleta* [*Valley v. Board of Supervisors* (1990)] 52 Cal.3d [553,] 565.) We uphold an agency's selection of alternatives unless it is 'manifestly unreasonable' or inclusion of an alternative does not '[contribute to] a reasonable range of alternatives.' (*Ibid.*)" (*Bay Area Citizens v. Ass'n of Bay Area Governments* (2016) 248 Cal.App.4th 966, 1018.) The rule of reason "requires the EIR to set forth only those alternatives necessary to permit a reasoned choice" and to "examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project." (Guidelines, § 15126.6, subd. (f).)

**The Detention Basin Alternatives Are Not Invalid**

Joshua's first argument is that the detention basin alternatives are "not valid" because they are not stand-alone projects but rather "future components of the overall Program and SFCJPA strategy," pointing to certain acknowledgements in the record that the projects in Reach 2 would "complement" or work "in concert" with the detention basin proposals in Reach 3. We reject the argument.

First, Joshua is simply wrong that the detention basin alternatives could not have been stand-alone projects. It was plainly possible to build detention basin facilities in Reach 3 without also completing the project. Indeed, the draft EIR notes that the "detention basins at Searsville, Webb Ranch, and the former plant nursery represent potentially feasible

12

alternatives that would, as a stand-alone project, provide real flood protection."  A December 19, 2016 revised notice of preparation for the draft EIR explained:  "In its Draft EIR, the SFCJPA will evaluate the No Action alternative and four other alternatives, each of which could be implemented as a stand-alone project to meet the objectives listed above."  And a March 6, 2017 letter from the California Department of Fish and Wildlife to the SFCJPA stated:  "Each of the Project alternatives is intended to be a stand-alone project that could be implemented subsequent to the existing Project to provide greater flood protection in the future."  Finally, the EIR itself expressly acknowledges that either detention basin alternative "could be implemented as a stand-alone project with no downstream improvements, or as a complementary project after downstream improvements are made."  In short, the record amply supports the conclusion the detention basin alternatives were stand-alone projects.

Joshua also argues that the EIR in this case does not provide an "accurate, stable, and finite project description" (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193), because, as his brief puts it, the EIR "analyz[es] options that are components of the current Project, rather than alternatives *to* the Project."  Not so.  The EIR provides a 47-page description of the project and its impacts, including clearly defining the "[m]ajor elements" of the Project as "Replacing Pope-Chaucer Bridge," "Downstream of that bridge, widening the Creek channel and replacing the wooden University Avenue Bridge parapet extension," "Enhancing habitat within the project area," and "Creating new recreational opportunities and connect to existing bike and pedestrian corridors."  The project is also clearly defined as the channel widening alternative from the first round of alternative selection. In short, despite the EIR's occasional suggestion that the project's goals could

13

be complemented or supplemented by the detention basin alternatives in Reach 3, the EIR does not fail to provide an accurate or stable project description.

*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, cited by Joshua, is not to the contrary. There, the city planning commission approved the proposed home improvement center on the condition that the project proponents also perform a road realignment. (*Id.* at pp. 1219–1220.) The court concluded that because the "project cannot be completed and opened legally without the completion of the road realignment," the road realignment and the home improvement center were one project for the purposes of CEQA. (*Id.* at pp. 1227–1231; see *id.* at p. 1229 [" 'Courts have considered separate activities as one CEQA project and required them to be reviewed together where . . . both activities are integral parts of the same project [Citation]' [Citation]"].) Such is plainly not the case here, where the project was neither legally nor practically conditioned on the detention basin alternatives in Reach 3—indeed, the EIR expressly stating the opposite, calling the detention basin alternatives "stand-alone" projects.[3]

---

[3] For similar reasons, we find unavailing Joshua's reliance on cases holding that "[a] public agency is not permitted to subdivide a single project into smaller individual sub-projects in order to avoid the responsibility of considering the environmental impact of the project as a whole. 'The requirements of CEQA "cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial." [Citation.]' (*Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188, 195–196.)" (*Orinda Assn v. Bd. of Supervisors* (1986) 182 Cal.App.3d 1145, 1171.) Such is not the case here, where the project was clearly defined and the detention basin alternatives expressly acknowledged to be stand-alone projects.

## Joshua Has Failed to Exhaust Administrative Remedies With Respect to His Argument Regarding the Floodwalls Alternative

Joshua's next argument is that the floodwalls alternative is "invalid" because it does not lessen the environmental impact of the project—instead, the EIR concluded that "[t]he Floodwalls Alternative would have impacts similar to the proposed project but over a much greater area along and at the top of the creek banks. Therefore, this alternative would have greater impacts overall than the proposed project."

Joshua has failed to demonstrate that he exhausted his administrative remedies with respect to this argument.

" 'In brief, the rule [of the exhaustion of administrative remedies] is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule is a jurisdictional prerequisite in the sense that it 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of stare decisis, and binding upon all courts.' [Citations.]" (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874, quoting *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292.)

Section 21177 addresses the exhaustion of remedies in CEQA cases. It provides that no action or proceeding may be brought alleging non-compliance with CEQA unless (1) the alleged grounds for noncompliance "were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close

15

of the public hearing on the project before the issuance of the notice of determination" and (2) the person bringing the action "objected to the approval of the project orally or in writing during the public comment period provided by this division or before the close of the public hearing on the project before the filing of notice of determination."  (§ 21177, subds. (a), (b).)

"The rationale for the rule is that an agency is entitled to learn the contentions of interested parties before litigation arises, so it will have an opportunity to address the contentions and perhaps render litigation unnecessary.  (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1394.)  To advance this purpose an interested party must present the exact issue to the administrative agency that is later asserted during litigation or on appeal.  (*Ibid*.)  General objections, generalized references or unelaborated comments will not suffice.  (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 910.)  ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." [Citation.]'  (*Id*. at p. 909.)"  (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 371.)

The petitioner bears the burden of demonstrating exhaustion of administrative remedies.  (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1136.)  And we employ a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.  (*Ibid*.)

Joshua's only argument that he exhausted his administrative remedies with respect to his challenge to the floodwalls alternative is that it is somehow encompassed within his argument the EIR did not include the required "range of reasonable alternatives."  (See Guidelines, § 15126.6 (a).)  His reply brief goes on to make reference to places in the record where he

16

made his argument, rejected above, that the Reach 2 and Reach 3 alternatives were "intertwined." But he nowhere identifies in the record any challenge to the floodwalls alternative, never mind the specific challenge he now raises. Instead, as noted, he points to general comments that the "Reach 2 and Reach 3 projects are intertwined," a comment by the Regional Board that the "DEIR should be revised to include . . . more robust description of the [SFC]JPA's analysis of potentially feasible alternatives," and an assertion that the California Department of Fish and Wildlife "offered comment on the alternatives, including the Floodwalls Alternative." Obviously, these general comments did not "present the exact issue to the administrative agency" and were not "sufficiently specific so that the agency has the opportunity to evaluate and respond to them." (*Hagopian v. State of California, supra*, 223 Cal.App.4th at p. 371.) Joshua has failed to carry his burden to demonstrate that he exhausted his administrative remedies with respect to his challenge to the floodwalls alternative.

**The EIR Considered Alternatives Other Than the No Project Alternative**

Joshua's next argument—an argument that occupies only two paragraphs in his opening brief—is that since the detention basin alternatives and the floodwalls alternative were not "valid," the No Project alternative is the "only true alternative remaining," and thus the EIR failed to consider a reasonable range of alternatives. Because we have rejected Joshua's argument that the detention basin alternatives were invalid, this argument necessarily fails as well.[4]

---

[4] In addition, as the SFCJPA observes, an EIR that considers only the no project alternative does not necessarily fail to consider a reasonable range of alternatives. (See *Save Our Access-San Gabriel Mountains v. Watershed*

**The SFCJPA Did Not Abuse Its Discretion In Adopting the Statement of Overriding Considerations**

Joshua's final argument is that the SFCJPA abused its discretion in adopting the statement of overriding considerations without first making the requisite findings that the alternatives were "infeasible." By no means.

" 'An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (§§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134.) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (§ 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another public agency and have been

---

*Conservation Authority* (2021) 68 Cal.App.5th 8, 31 ["Plaintiff contends CEQA, the Guidelines, and Supreme Court case law require an EIR to analyze more than the 'no project' alternative. That is not correct"]; *San Franciscans for Liveable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 633 [" To the extent SFLN would have us conclude, as a matter of law, that consideration in the EIR only of a proposed project and a no project alternative is inadequate, we reject that contention"]; *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 196–199.) Joshua does not offer any response to these cases, except to assert that they are "factually distinct," without explaining how.

18

adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the EIR infeasible, and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects. (§§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).) A finding that specific overriding project benefits outweigh the significant environmental effects (§ 21091, subd. (b)) is known as a statement of overriding considerations. (Guidelines, § 15093.)' " (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at pp. 725–726.)

The EIR concluded that, even with mitigation measures, the "[c]onstruction activities proposed as part of the project would temporarily increase emissions in pollutants of concern," and "the impact of the project's construction activities on cumulative air quality impacts is expected to be significant and unavoidable." "Primarily due to their more remote locations, both the Former Nursery Detention Basin Alternative and the Webb Ranch Detention Basin Alternative are estimated at this time to have fewer/less potential impacts on the following resources than the proposed project: [] Aesthetics [] Air Quality [] Hazardous Materials and Public Health [] Noise and Vibration [] Recreation [] Transportation and Traffic [and] Utilities and Service Systems."

However, the EIR went on:

"Between the Former Nursery Detention Basin Alternative and Webb Ranch Detention Basin Alternative, the Former Nursery Detention Basin Alternative would result in fewer impacts because the nearest noise-sensitive land uses to this alternative are 400 feet away. The Webb Ranch Detention Basin Alternative is within 35 feet of the nearest sensitive land uses; therefore construction of this alternative is expected to expose persons to

19

greater noise and vibration impacts relative to the Former Nursery Detention Basin Alternative.

"The Former Nursery Detention Basin Alternative in consideration of basin sizing could not provide as much flood protection, as quickly, or provide similar benefits to aquatic species (e.g., salmonid habitat), as the proposed project. However, information available to date indicates that the Former Nursery Detention Basin Alternative would have less environmental impacts than the proposed project on many resources. For these reasons, the Former Nursery Detention Basin Alternative is identified as the environmentally superior alternative. However, by itself, this alternative cannot achieve the benefits of the proposed project in terms of the level of flood control that could be achieved (one basin could achieve a peak flow reduction of 800–1,000 cfs versus the proposed project, which could achieve a reduction of 1,800 cfs). Further, this alternative would not achieve the same level of benefit as the proposed project in terms of habitat enhancement. These benefits include improvement of hydrologic functions through channel widening and construction of habitat enhancement features. For these reasons, the Former Nursery Detention Basin Alternative was not selected."

Joshua's complaint with the EIR is essentially that it did not expressly state that the detention basin alternatives were "infeasible"—indeed, his reply brief styles his argument as "SFCJPA Cannot Point to Any Language in the Statement of Overriding Considerations Showing That the Board of Directors Made a Finding of Infeasibility Regarding Project Alternatives." But although the EIR did not use the word "infeasible," it makes clear that the SFCJPA rejected the detention basin alternatives because they "cannot achieve the benefits of the proposed project in terms of the level of flood control," and "would not achieve the same level of benefit as the proposed

20

project in terms of habitat enhancement." In other words, the SFCJPA found the detention basin alternatives infeasible for "policy reasons," including that the alternatives would not achieve the desired project objectives. This was a proper basis for a finding of infeasibility under CEQA. (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1000–1002 [no abuse of discretion in finding alternatives were infeasible because "they failed to achieve what the Council regarded as primary objectives of the [project]"]; *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 18 [county properly determined within its discretion that alternatives were infeasible because "none would achieve the core objectives to the same extent as the Project"].) And Joshua's disagreement with this decision amounts to a policy disagreement with the SFJCPA—a disagreement that does not demonstrate an abuse of discretion. (See *California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 1001 [appellants' challenge to infeasibility determination "represents nothing more than a 'policy disagreement with the City'"]; *San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at p. 18 [plaintiff's "disagreement with the [agency]'s policy determination is not a basis for setting aside the [EIR]".)

Joshua's reliance on *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341 is unavailing. There, the defendant trustees sought to expand a small college campus into a larger institution on a former Army base, and prepared an EIR that found in relevant part that contributions to the Ford Ord Reuse Authority could mitigate certain of the project's environmental impacts, but that such contributions would amount to an assessment prohibited by the state Constitution and constitute a gift of public funds and thus be unlawful, such that mitigating the effects through

21

contributions was "infeasible" for "legal" reasons. (*Id*. at 351–353.) Our Supreme Court considered the legal question of whether the contributions were unlawful under de novo standard of review, concluding that they were not and that the trustees had therefore abused their discretion. (*Id*. at p. 355.) In so doing, the court expressly noted that the case involved a purely legal question, and not "factual and environmental conclusions in the EIR based on conflicting evidence" to which the court would owe "much deference" under the abuse of discretion standard of review. (*Ibid*.) By contrast, in this case, the SFCJPA's finding that the detention basin alternatives were infeasible is a "factual and environmental conclusions in the EIR based on conflicting evidence," and we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

22

 

                                         _____

                                         Richman, Acting P. J.

We concur:

_____

Miller, J.

_____

Mayfield, J. *

*Joshua v. San Francisquito Creek Joint Powers Authority* (A163294)

      *Superior Court of Mendocino County, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.